2005-NMCA-058

112 P.3d 1142

**Floyd H. GRANT, III, Petitioner-Appellee/Cross-Appellant,**

v.

**Leslie D. CUMIFORD, f/k/a Leslie D. Interrante, Respondent-Appellant/Cross-Appellee.**

**No. 24,445.**

Court of Appeals of New Mexico.

March 31, 2005.

Sandra Morgan Little, Les W. Sandoval, Little & Gilman–Tepper, P.A., Albuquerque, NM, for Appellee/Cross–Appellant.

Leslie D. Cumiford, Albuquerque, NM, Pro Se Appellant/Cross–Appellee.

## OPINION

BUSTAMANTE, Chief Judge.

{1} Both Mother and Father appeal from the district court's custody, timeshare, and child support order that arose from Father's motion to modify custody, timesharing, and support. The district court sealed the trial on the merits, but allowed a local television station to attend and televise the proceedings, while prohibiting the release of the recording. The court determined that there had been no material change in circumstances to warrant a change in legal and

physical custody, but clarified timesharing and support responsibilities of the parents and ordered the parties to pay their own attorney fees. The court also ordered Father to pay Mother's share of the guardian ad litem's (GAL) fees and to deduct that amount from his support responsibilities. Mother appeals the rulings on child support and attorney fees; Father appeals the custody ruling. Both parents challenge different aspects of the court's rulings sealing the hearing but permitting television cameras in the courtroom. We affirm the court's custody ruling, but for the reasons that follow, we reverse and remand the support issues. In light of our rulings, we also reverse and remand the issue of attorney fees.

**BACKGROUND**

{2} Father and Mother were never married, but had a child on November 2, 1994. On April 22, 1996, the district court entered a stipulated judgment and decree of custody and child support giving the parents joint legal custody. By that time, Mother and Child were living in Albuquerque, and Father was living in Norman, Oklahoma. The order provided that Mother would have primary physical custody and Father would have periods of visitation, but stated that Child would not sleep away from his own bed and/or Mother until he was at least two and one-half years old. Evidence was presented at trial that Child made his first visit to Oklahoma in December 1998. Between 1999 and 2000, Child made approximately two visits to Oklahoma, with his parents meeting in Amarillo, Texas to transfer him from one parent to the other. In the summer of 2001, when Child was six, he began to fly to Oklahoma, and in the summer of 2002, Father told Mother that he wanted Child to spend most of the summer with him, but Mother wanted Child to stay in Oklahoma for only two to three weeks. Father testified that negotiations about visits became increasingly difficult, and in June 2002 he filed a motion to modify custody due to a significant change in circumstances. In his motion to modify custody, Father sought primary physical custody, claiming that Child wanted to spend more time with him and that Mother was failing to comply with the provisions of the 1996 decree. Father requested the appointment of an expert under Rule 11–706 NMRA to conduct a custody evaluation and to make recommendations as to Child's best interests.

{3} Following the filing of Father's motion to modify custody, the relationship between Child's parents appears to have become increasingly contentious, and a GAL was appointed to represent Child's best interests. Then in November 2002, the court appointed an expert under Rule 11–706 to perform a custody evaluation. The court-appointed expert completed the psychological evaluation and parenting plan on March 14, 2003, which recommended a continuation of joint legal custody and primary residence with Mother.

{4} By this time, numerous motions had been filed, alleging claims by Father that Mother was not complying with the joint custody and visitation provisions, allegations by the GAL that Mother had made unsubstantiated claims of sexual abuse against Father, and claims by Mother that the GAL was hostile to her and not objective. The conflict between the parties culminated in Father's filing a motion on March 13, 2003, to modify joint legal custody and award sole legal custody to Father. A hearing on this motion was set for April 29, 2003.

{5} On April 7, 2003, Mother moved to adopt the March 14 parenting plan recommended by the court-appointed expert with only one change concerning the return date from summer vacation. Father objected to this change and requested a two-day evidentiary hearing on the parenting plan. Father and the GAL then filed additional motions alleging that Mother had refused to take Child to see a therapist and refused to allow Father telephone access to Child. At the hearing on April 29, 2003, the court appointed a therapist for Child, ordered the parties to follow the recommendations of the court-appointed expert on a temporary basis, ordered the parties to attend a facilitation before trial, and set a trial date for August 20–21, 2003. The court also ordered that all pending motions would be heard at trial.

{6} On May 16, 2003, however, the GAL filed an emergency motion to transfer custody from Mother to Father in Oklahoma. In this motion, the GAL made the following

allegations: that Mother had unreasonably attempted to block Father's time with Child; that Mother had gone to great lengths to prevent Father from having a meaningful relationship with Child; that Mother had falsely accused Father of being a pedophile; that Mother had turned against the GAL and the court's expert for failing to accept her accusations; that Mother refused to take Child to therapy when the therapist did not accept Mother's accusations; that Father, whom the GAL found credible, had reported Mother was obstructing Father from communicating with Child; that by enrolling Child in a karate program, Mother was attempting to influence Child's feelings about going to Oklahoma; that Mother had claimed Father had convictions for driving while intoxicated and later acknowledged this was not true; that Mother's home was toxic and she should receive only supervised visitation; and that Mother had been uncooperative in general with the GAL. On May 20, 2003, a day before the hearing on the GAL's motion, the court-appointed expert issued an addendum to his psychological evaluation, in which he recommended that Father have temporary sole legal and physical custody of Child for the summer.

{7} Following a hearing on the GAL's motion, held on May 21, 2003, a week before Child was due to go to Oklahoma for the summer, the court entered a minute order awarding immediate, sole, temporary custody of Child to Father in Oklahoma and awarding one week of supervised visitation to Mother in July. A week after Child left for Oklahoma, Father filed a motion to modify Mother's summer visitation, requesting that Mother travel to Oklahoma and be supervised at all times. The motion alleged that Mother had published a flyer claiming that Child had been removed from her home without notice and without justification. At a hearing held on June 4, 2003, the court ordered that the GAL had authority to determine whether summer visitation should be modified and noted that the GAL did not intend to modify the visitation at that time.

{8} The GAL initially determined that Child should visit Mother in Albuquerque for seven days from August 3, 2003. However, on July 18, 2003, the GAL filed a report recommending the visit be changed to coincide with Father's trip to Albuquerque for court-ordered mediation from July 30, 2003, until August 2, 2003. Because Mother was also ordered to participate in the mediation at this time, her access to Child was to be restricted to the evenings until Father picked up Child and took him to a hotel. In addition, the GAL recommended that all of Mother's visitation be supervised.

{9} On August 11, 2003, the court-appointed expert issued a second addendum to his psychological evaluation, recommending that Father have sole legal custody of Child and Mother have a limited amount of visitation. Less than a week before the trial on the merits, held on August 20–25, 2003, the GAL filed a motion to exclude televised media from the hearing and a motion to seal the hearing on the merits. The court denied the motion to exclude the media, but ordered that the media could "not release the outtakes of the footage to any party or nonparty in this matter." The court also sealed the hearing to all who did not have a direct interest in the matter.

{10} Following the trial, the court ruled that there had not been a material change in circumstances since the 1996 stipulated judgment warranting a change in legal and physical custody. In addition to clarifying timesharing arrangements, the court ordered Father to pay sixty percent and Mother forty percent of Child's support. The court also abated Father's support by one-half for June and July 2003, when Child would be with Father. The parties were ordered to pay the court expert and the GAL fees in the same proportion as child support. In addition, the court ordered Father to pay Mother's share of the GAL fees and then to deduct up to $300 per month from child support to offset those payments. The parties were ordered to pay their own attorney fees. This appeal and cross-appeal followed.

{11} We include the remaining facts pertinent to each appellate issue in our discussion.

## DISCUSSION

{12} Mother raises five issues in her appeal: whether the district court (1) abused

its discretion in ordering both parties to pay their own attorney fees, (2) erred in imputing salary to Mother, (3) erred in ordering Father to pay the GAL fees and to deduct Mother's portion from child support payments, (4) improperly abated Father's summer child support payments on an annual basis, and (5) improperly sealed the hearing on the merits. Father raises two issues in his cross-appeal: whether the court abused its discretion in (1) failing to modify custody; and (2) allowing the news media to be present in the courtroom. Because the issues of support and attorney fees follow from the resolution of the custody issue, we first address the substantive issue of whether the court erred in failing to modify custody.

## Child Custody

{13} Father argues that the district court should have given him sole legal and physical custody of Child. He contends that there was overwhelming evidence before the district court that circumstances had substantially changed since the entry in 1996 of a stipulated custody order awarding joint legal custody to both parents and primary physical custody to Mother. As Father acknowledges, there is a presumption that joint custody is in the best interests of the child. NMSA 1978, § 40–4–9.1(A) (1999). And, as this Court has stated, "[a] court may modify a custody order only upon a showing of a substantial change in circumstances since the prior order that affects the best interests of the children." *Thomas v. Thomas,* 1999–NMCA–135, ¶ 10, 128 N.M. 177, 991 P.2d 7. "We will overturn the trial court's custody decision only for abuse of discretion, and we will uphold the court's findings if supported by substantial evidence." *Id.* "An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Sims v. Sims,* 1996–NMSC–078, ¶ 65, 122 N.M. 618, 930 P.2d 153. "To reverse the trial court under an abuse-of-discretion standard, 'it must be shown that the court's ruling exceeds the bounds of all reason ... or that the judicial action taken is arbitrary, fanciful, or unreasonable.'" *Edens v. Edens,* 137 N.M. 207, 109 P.3d 295, 2005–NMCA–033, ¶ 13, (2005) (quoting *Meiboom v. Watson,*

2000–NMSC–004, ¶ 29, 128 N.M. 536, 994 P.2d 1154 (internal quotation marks and citation omitted)). "When there exist reasons both supporting and detracting from a trial court decision, there is no abuse of discretion." *Talley v. Talley,* 115 N.M. 89, 92, 847 P.2d 323, 326 (Ct.App.1993).

{14} Father argues in his cross-appeal that he presented overwhelming evidence at trial to demonstrate a material change in circumstances. Father argues that the court-appointed expert's May and August reports showed Mother's actions were causing emotional damage to Child, and that the expert's May report concluded that Mother was trying to align Child with her and to destroy the Father/Child relationship. Father states that the court acknowledged Mother's destructive conduct, which demonstrated that there was no evidentiary support for the court's statement that the parties had worked well together.

{15} Father also argues that the expert's August report concluded that the conflict between the parents was expected to continue and that Father should have sole custody. In addition, Father argues that the GAL concluded that it was in Child's best interest to award sole custody to him because Mother's "fabrication of pedophilia and alcoholism would make it unlikely that joint custody was a workable arrangement." Father argues that there was evidence that Mother restricted Father's access to Child at school, that she falsely accused Father of pedophilia, driving while intoxicated, and alcohol abuse, that Mother interfered with Child's telephone calls to Father, that she refused to let Child go to Oklahoma over the Easter weekend, that she refused to take Child to therapy, and that she tried to brainwash Child against Father. In light of all this evidence, Father contends that the court abused its discretion in not finding a material change in circumstances.

{16} The recorded transcript of the trial, however, indicates that the court was not persuaded by the testimony of the court-appointed psychological expert and the GAL. The court specifically questioned the court-appointed expert about what had caused him

to change his recommendation between March 14, 2003—the date of the original report recommending joint legal custody and primary physical custody with Mother—and May 20, 2003—the date of the first addendum to the report recommending temporary sole legal custody and primary physical custody with Father. On cross-examination of the expert, Mother's counsel challenged the accuracy of the expert's version of the events he claimed caused him to change his recommendation between March and May 2003.

{17} In addition, the testimony of Mother's expert psychologist, who was hired to provide a second opinion on the custody recommendation, questioned the court-appointed expert's conclusions in the May addendum. Mother's expert noted that the information on which the court's expert based his first addendum to his report was incomplete and one-sided because the expert never interviewed Mother or Child to obtain their versions of what had occurred, and noted that there was no evidence from the psychological tests to support some of the conclusions the court's expert had drawn about Mother, stating that the expert appeared to have relied on data provided by Father and the GAL. Mother's expert also testified that there appeared to have been no major breaches of the parenting plan to justify recommending a change in custody.

{18} Specifically, Mother's expert stated that if Mother's version of the facts indicated that, rather than simply refusing to take Child to counseling, Mother had sought clarification from the court about whether such a visit (sought by the GAL in preparation for an additional custody evaluation) was necessary, that information should have been included in the court-appointed expert's report. She also testified that where the evidence indicated that Child had been involved in a karate class before the summer visitation was to occur, his participation in that program would have been an insufficient basis to recommend a change in custody. Mother's expert also testified that even if Mother blocked the Easter visitation, Child had made numerous visits to Oklahoma and was due to spend the entire summer there and in her view, that was not a sufficient reason to recommend a change in custody. She also noted that there was consistent phone contact between Father and Child. Moreover, from reviewing the record, Mother's expert observed, it appeared that the allegations that Father had been convicted of driving while intoxicated were based on faulty information supplied to Mother, and that the allegations were withdrawn shortly after they had been raised, once Mother became aware they were untrue. In addition, Mother explained that Child's behavior had led her to consult physicians about the possibility of sexual abuse.

{19} The court's concern about what specifically had occurred between March and May to change the custody recommendation became apparent again when the court questioned Mother's expert. The court stated that it was trying to evaluate what had happened to change the court-appointed expert's opinion about custody, resulting in three different reports on March 14, 2003, May 20, 2003, and August 11, 2003. Mother's expert responded that the recommendations of the court's expert had changed by May 20, 2003, but that those recommendations were based on incomplete information.

{20} In its oral ruling, the court stated that from 1996 to 2002, the parties had been able to function very well without court intervention, but in June 2002 things had spiraled out of control. The court did not find, however, that there had been a material and substantial change in circumstances warranting a change in custody. From our review of the record, we find no abuse of discretion and affirm the district court's decision. Therefore, we will proceed to address Mother's issues regarding child support and attorney fees.

**Child Support**

{21} Mother raises three issues concerning the child support award: that the district court erred in imputing income to Mother, in ordering Father to pay the GAL fees and to deduct Mother's portion from child support payments, and in abating Father's summer child support payments on an annual basis. "The setting of child support is left to the sound discretion of the trial

court as long as that discretion is exercised in accordance with the child support guidelines." *Quintana v. Eddins,* 2002–NMCA–008, ¶ 9, 131 N.M. 435, 38 P.3d 203. "[E]ven when we review for an abuse of discretion, our review of the application of the law to the facts is conducted de novo. Accordingly, we may characterize as an abuse of discretion a discretionary decision that [is] premised on a misapprehension of the law." *N.M. Right to Choose/NARAL v. Johnson,* 1999–NMSC–028, ¶ 7, 127 N.M. 654, 986 P.2d 450 (internal quotation marks and citations omitted) (alteration in original). Findings made by the district court about the parents' incomes, as required by the guidelines to apportion child support, are reviewed to determine whether they are supported by substantial evidence. *Quintana,* 2002–NMCA–008, ¶ 9, 131 N.M. 435, 38 P.3d 203; *see* NMSA 1978, § 40–4–11.1(E) (1995). Questions of law are reviewed de novo. *Styka v. Styka,* 1999–NMCA–002, ¶ 8, 126 N.M. 515, 972 P.2d 16.

### Imputation of Income

{22} Section 40–4–11.1(C)(1) defines income as "actual gross income of a parent if employed to full capacity or potential income if unemployed or underemployed." At trial, the district court admitted evidence of Mother's actual income, which was approximately $51,000 per year. Mother testified that she worked at Sandia Laboratories twenty-five hours per week, but that she worked an additional twenty-five to thirty hours at her own business, which had not yet generated any income. The district court stated when ruling that it had imputed income to Mother because although Mother was entitled to start her own business, she could not do it at Child's expense.

{23} Mother argues that income should not have been imputed to her because she was fully employed, not underemployed or working part-time. Mother argues that under *Boutz v. Donaldson,* 1999–NMCA–131, ¶¶ 4–6, 128 N.M. 232, 991 P.2d 517, the district court should not have imputed income to her because, like the mother in that case, she had made and continued to make a good faith effort to succeed in developing her business. In *Boutz,* this Court wrote that "[i]t is for the

trial judge … subject to judicial review, to assess Mother's efforts, sincerity, conscientiousness, and credibility, and then to decide whether Mother has acted in good faith to earn and preserve as much money to support her children as could reasonably be expected under the circumstances." *Id.* ¶ 6. More recently, in *Quintana,* we reaffirmed the test described in *Boutz* and stated "that the trial court must determine whether a parent's career choice is made in good faith and is reasonable under the circumstances." *Quintana,* 2002–NMCA–008, ¶ 23, 131 N.M. 435, 38 P.3d 203. We stated that in the absence of greater legislative guidance, the determination of underemployment "will be left to the sound discretion of the trial court, to be made after considering whether the parent has acted in good faith and whether the parent's actions are reasonable under the totality of the circumstances." *Id.* ¶ 24 (citing *Boutz,* 1999–NMCA–131, ¶¶ 5–6, 128 N.M. 232, 991 P.2d 517).

{24} This is not a case in which Mother is working part-time or is clearly underemployed. Indeed, there was evidence before the district court that Mother was working more than forty hours per week. Therefore, the questions for the district court to consider were whether Mother was acting in good faith in her career choice and whether those actions were reasonable under the circumstances. Because the district court did not provide any explanation or findings and conclusions in relation to Mother's good faith and the reasonableness of her actions in reaching the ultimate determination of imputation of income to Mother, we remand this issue for reexamination to assure that the court has considered the imputation issue using the test set forth in *Quintana.*

### Deduction of the GAL Fees from Child Support

{25} Mother also argues that the district court erred in ordering Father to pay the GAL fees and to deduct up to $300 per month from child support payments in order to pay Mother's share of the GAL fees. As we stated earlier, the setting of child support is within the sound discretion of the district

court, "exercised in accordance with the child support guidelines." *Quintana,* 2002–NMCA–008, ¶ 9, 131 N.M. 435, 38 P.3d 203. Under NMSA 1978, § 40–4–11.2 (1989), any deviation from the guidelines "shall be supported by a written finding in the decree, judgment or order of child support that application of the guidelines would be unjust or inappropriate." Section 40–4–11.2 then continues to explain that "[c]ircumstances creating a substantial hardship in the obligor, obligee or subject children may justify a deviation upward or downward from the amount that would otherwise be payable under the guidelines."

{26} Mother argues that nothing in the guidelines provides for a deduction from child support to pay a GAL. She also argues that deducting GAL fees from support constitutes a tax on child support and deprives Mother of the opportunity to dispute the GAL fees. Father argues, on the other hand, that because Mother had previously been ordered to pay the GAL fees and had refused, the court was entitled to deduct the fees from child support.

{27} The court is authorized to appoint a GAL in contested custody cases, pursuant to NMSA 1978, § 40–4–8 (1993), and to allocate expenses, costs, and attorney fees between the parties. However, nowhere in either the child support guidelines or the GAL statute is any specialized procedure outlined to ensure the payment of GAL fees by deducting them from child support. Moreover, our Supreme Court has recognized the "ongoing right of a child to receive support money from his [parent]." *Brannock v. Brannock,* 104 N.M. 385, 386, 722 P.2d 636, 637 (1986) (internal quotation marks and citation omitted). Although Father argues that Mother cites no law negating the district court's authority to modify child support payments "to ensure the payment of Mother's portion of the GAL's outstanding fees," Father has cited no law requiring the GAL's right to payment to take priority over Child's right to support, especially when the support guidelines indicate that any deviation must be justified by a showing of hardship.

{28} In the absence of legislative guidance to the contrary, therefore, we see no reason why GAL fees should be treated any differently from any other attorney fees, and we reverse that part of the custody and support order requiring Father to pay Mother's share of the GAL fees and to deduct up to $300 per month from his child support obligation.

**Abatement of Summer Child Support**

{29} Mother also argues that the court improperly abated Father's summer child support payments. Mother states that although the district court's written order states that Father's child support payments for June and July 2003 are to be abated by one-half, the written worksheet shows an annual abatement. Mother argues that because this ruling effectively modifies the amount of support required by the guidelines, the court should have explained its reasons in the order. Father responds that it was within the district court's discretion to modify the support in this way. Mother also argues that the abatement in the custody and support order only refers to two months in 2003 and not to future years.

{30} The court's child support worksheet stated that Father's monthly share of child support was to be $1416. Section 40–4–11.1(F)(1) permits "a partial abatement of child support for visitations of one month or longer" in visitation situations like the one before us. *See* § 40–4–11.1(D)(2) (defining a "basic visitation" custody arrangement); *see also Erickson v. Erickson,* 1999–NMCA–056, ¶ 3, 127 N.M. 140, 978 P.2d 347 (discussing the statutory definitions of custody arrangements). Because Father was awarded visitation for June and July, the court was permitted to abate Father's support payments. In this case the court abated the support payments by one-half for the months of June and July, thus reducing the total support for each year by $1416. The court's oral ruling clarified that the court spread the abatement for those two months over the course of the year. Accordingly, the court ordered Father's support payments to be $1298 per month, beginning on September 1, 2003 (($1416 × 11) ÷ 12).

{31} We hold that an annual abatement of child support of this type is not a deviation from the guidelines, as Mother argues, but is explicitly provided for in those guidelines. Contrary to Mother's argument, therefore, the court was not required to state in its order its reasons for deviating from the guidelines. *Cf.* § 40–4–11.1(A) (providing for a statement explaining reasons for deviation from the guidelines). In addition, we are not persuaded that the order only mandates abatement for 2003. The order specifically abates support for 2003 and, consistent with the district court's oral ruling, calculates future support obligations with the same abatement based on the parties' timesharing arrangement.

{32} In light of our ruling on the imputation of Mother's income, however, Mother's income is currently undetermined. Accordingly, on remand, in determining the precise amount of the parents' support obligations, the district court should consider whether, and if so, to what extent, the abatement amount should be different.

**Attorney Fees**

{33} Mother argues that the district court failed to properly consider the factors set forth in Rule 1–127 NMRA to determine whether to award Mother her attorney fees. Mother also argues that she was denied the ability to prepare and argue her case. As we understand her, Mother argues that the district court stated on August 25, 2003, that if the parties wanted a hearing on attorney fees, the court would hold one. Mother states, however, that at a hearing on October 3, 2003, which had been moved forward from October 10, 2003, the court refused to hear arguments on the issue. In response, Father argues that the court ruled on attorney fees on August 25, 2003, and that Mother did not preserve any argument on the issue. We are not persuaded by Father's contentions that the court ruled that the issue of attorney fees had been fully addressed on August 25, 2003, or that Mother's arguments were not preserved.

{34} The transcript of the trial reveals that following the presentation of evidence on August 22, 2003, the court reviewed all pending motions with the parties. After instructing the parties on how it wanted to deal with the pending motions, the court instructed the parties to come to court on August 25, 2003, with information relevant to the four factors listed in Rule 1–127 regarding attorney fees, and to be prepared to give the court that information orally. The court stated that it would give its recommendation on fees on August 25, 2003. On August 25, 2003, after ruling that all issues raised by the trial and motions had been addressed, the court then recommended that each party pay his or her own attorney fees. Neither party sought to introduce evidence of costs and fees at that time, and the court acknowledged that it had not heard evidence on these issues, stating that if the parties wanted another hearing on the issues of costs and fees, the court would give it. Neither party indicated at that time that it wanted a hearing on the issue, and no request for a hearing appears in the record. Mother represents, however, that she filed an attorney affidavit on attorney fees and costs with the court on September 9, 2003. Although this document does not appear in the record, Father's motion to strike the affidavit, filed on September 16, 2003, states that such a motion was filed. Father represents in his answer brief, however, that although he received a copy of the affidavit, he has no knowledge of whether it was filed with the court. At the October 3, 2003, hearing, however, the court not only noted that it had recommended that each party pay his or her own attorney fees, it also acknowledged receipt of Mother's affidavit. The court then stated that, having reviewed the entire file and notes from the trial and having considered all the factors required by rule, statute, and case law, it was ruling that each party pay his or her own attorney fees.

{35} By presenting the court with an affidavit, Mother sufficiently alerted the court's attention to her request for attorney fees to have preserved this issue for appeal. *See Marquez v. Marquez,* 74 N.M. 795, 799, 399 P.2d 282, 285 (1965) (holding that "[t]he trial court must be alerted to a claimed nonjurisdictional error in order to preserve it for consideration on appeal"). Under NMSA 1978, § 40–4–7(A) (1997), "the determination

of whether to grant an award of attorneys' fees and the amount of such award is within the discretion of the trial court and will be reviewed only to determine whether there has been an abuse of discretion." *Monsanto v. Monsanto,* 119 N.M. 678, 681, 894 P.2d 1034, 1037 (Ct.App.1995). Rule 1–127 requires that the court

> consider relevant factors presented by the parties, including but not limited to:
>
> A.   disparity of the parties' resources, including assets and incomes;
>
> B.   prior settlement offers;
>
> C.   the total amount of fees and costs expended by each party, the amount paid from community property funds, any balances due and any interim advance of funds ordered by the court; and
>
> D.   success on the merits.

Although the court stated that it had considered these factors, because we have remanded the issue of Mother's income, we also remand this issue for the district court to determine whether disparity of income combined with success on the merits affects the earlier ruling on attorney fees. Accordingly, Mother's issue of whether she should have been given more time to prepare an argument on the issue of attorney fees is now moot.

## Limiting Public Access to the Trial

{36} Mother and Father both raise issues related to the court's rulings sealing the hearing but allowing the televising, without the release of footage, of the proceedings. Less than a week before the trial on the merits, the GAL filed two motions: (1) to exclude the televised media from the hearing on the merits, and (2) to seal the hearing on the merits to protect the emotional health of the Child. The court's written orders denied the motion to exclude the media, but closed the courtroom to all persons not having a direct interest in the matter.

{37} We first address the issue raised by Mother in her brief-in-chief that the court improperly sealed the hearing on the merits. The GAL moved to seal the hearing to protect the emotional health of Child on August 18, 2003. On August 19,

2003, both Father and a local television station responded to this motion. The television station argued that the courtroom should be open and that the GAL had not met his burden of proof to close proceedings. Father's response supported the GAL's position. Mother did not respond, and the court heard the motion immediately before trial. Mother only argued very briefly about factual matters, but the issue Mother raises on appeal was clearly before the district court, as argued by the television station, and we will therefore consider Mother's issue preserved for appeal.

{38} Mother appeals only from the court's order granting the GAL's motion to seal the hearing and close the courtroom to all persons not having a direct interest in the matter. The order defined those with a direct interest as the parties, the television station representatives, and the attorneys and members of their staff working on the case. Although we note that the court's oral ruling also appeared to seal the court records, the written order, signed by the attorneys for all the parties, does not reflect that. Because the court's written order only ordered the sealing of the hearing on the merits and because that hearing has already occurred, we hold that this issue is moot. *See Hamman v. Clayton Mun. Sch. Dist. No. 1,* 74 N.M. 428, 429, 394 P.2d 273, 274 (1964) (stating that "[a] case is moot when it does not involve any actual controversy [or][w]here the issues involved in the trial court no longer exist" (internal quotation marks omitted)); *Insure N.M., LLC v. McGonigle,* 2000–NMCA–018, ¶¶ 26–27, 128 N.M. 611, 995 P.2d 1053 (refusing to issue an advisory opinion where a defendant's claim had been rendered moot).

{39} In his cross-appeal, Father appeals from the order denying the GAL's motion to exclude the media from the courtroom. Father filed a response supporting the GAL's position. The court's order denied the GAL's motion to exclude the media from the trial, but prohibited it from releasing its footage. The only part of this order that has future effect is the ruling prohibiting the release of footage, and neither party raises an issue from that part of this order.

We hold, therefore, that because the hearing has already occurred, the issue Father raises concerning the presence of the media in the courtroom is moot.

## CONCLUSION

{40} For the reasons we have given above, we affirm the district court's ruling that there had been no material change in circumstances justifying a change in legal and physical custody. We reverse that part of the court's order requiring Father to pay Mother's share of the GAL fees and to deduct that amount from his monthly support payments. We also reverse the court's ruling imputing salary to Mother and remand for the district court to determine whether Mother's choice of self-employment was in good faith and was reasonable under the circumstances. Because Mother's income remains undetermined, we also remand the issue of whether Mother should have been awarded attorney fees under Rule 1–127. For the same reason, although the district court was authorized to abate Father's child support payments, we remand that issue for the court to determine what the parties' support payments should be. Finally, we hold that the issues Mother and Father raise concerning the sealing of the hearing and the presence of the media at the trial on the merits are moot. On remand, the district court should consider whether Appellant is entitled to costs under Rule 1–054(D) NMRA.

{41} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN and CYNTHIA A. FRY, Judges.