This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**TUE THI TRAN,**

Petitioner-Appellant,

and

**CLINTON W. DEMMON,**

Intervenor-Appellant,

v.                                                                          **No. 32,677**

**ROBERT G. BENNETT,**

Repondent-Appellee.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**T. Glenn Ellington, District Judge**

Caren I. Friedman
Santa Fe, NM

for Appellants

Law Office of Jane B. Yohalem
Jane B. Yohalem
Santa Fe, NM

for Appellee

**MEMORANDUM OPINION**

**SUTIN, Judge.**

**{1}** This appeal stems from a co-parenting arrangement between Appellants Tue Thi Tran (Mother) and Clinton Demmon and Appellee Robert Bennett pertaining to one child (Child). The co-parenting arrangement was formalized in a memorandum of agreement among the parties and was entered as a stipulated court order in 2007 as part of Mother's divorce from Bennett. Demmon is Child's biological father; however, Mother and Bennett were married when Child was conceived.

**{2}** Mother and Demmon appeal from the district court's amended order on advisory consultation objections and parenting plan (the parenting order) and also its orders holding them in contempt and ordering them to pay Bennett's contempt-related attorney fees. We conclude that Appellants have not demonstrated that the district court erred in entering the orders at issue. We affirm.

**BACKGROUND**

**{3}** Mother and Bennett were married in 1998 in Mother's home country of Vietnam, and a year later, they moved to Santa Fe. During Mother's marriage to Bennett, Mother and Demmon conceived Child. Mother and Bennett remained married and continued living together throughout Mother's pregnancy, and when Child was born in 2003, Bennett was the named father on Child's birth certificate.

{4} Mother, Bennett, and Child lived together after Child's birth, and Demmon would visit Mother and Child when Bennett was not home. In 2005, when Child was twenty months old, Mother and Child moved into Demmon's home. Initially, after Mother and Child moved into Demmon's home, Mother and Bennett continued to care for Child together, splitting Child's time between them with a "50-50 time share arrangement."

{5} The matter of when Bennett learned of Child's paternity is a point of contention between Mother and Bennett, with Mother claiming that Bennett knew during her pregnancy that he was not Child's biological father, and Bennett claiming that he did not learn of the Child's true paternity until after he and Mother were separated. In any event, in 2006 Mother virtually terminated Bennett's contact with Child and then filed for a divorce from Bennett. Seeking to regain his contact and visitation with Child, Bennett moved for the court's intervention, pursuant to a then-effective temporary domestic order, to prevent Mother from interfering with his relationship with Child. Within days of Bennett's requested court intervention in regard to his relationship with Child, Demmon filed a commencement of motion to establish paternity of Child, who was then three and a half years old. Demmon attached to his motion the results of a DNA test demonstrating his biological paternity of Child. Thereafter, Mother, Demmon, who became an intervenor in the divorce case, and Bennett engaged in a

3

nearly year-long dispute over Bennett's rights in regard to Child. Eventually, through mediation, Mother, Demmon, and Bennett reached an agreement and memorialized their agreement in a memorandum of agreement (the Agreement) in September 2007.

{6} The Agreement stated, among other things, that Mother, Demmon, and Bennett mutually agreed that Child

> has three co-parents—[Mother, Demmon, and Bennett]. [Demmon and Mother] affirm that [Bennett] as a co-parent is part of [Child's] life and deserves time and involvement with [Child]. All three will demonstrate through cooperative and supportive actions their shared primary concern for [Child's] well-being. Each will encourage and support [Child's] relationships with the others.

The Agreement also stated that Bennett "will be included in shared decisions related to [Child's] health and education (with one vote to [Demmon] and [Mother's] two). All of his co-parents will take [Child's] expressed desires and concerns into account." Further, the Agreement stated that Bennett "is willing to contribute to [Child's] education and dental expenses[,]" but that Mother and Demmon did not "expect or require such contribution." The Agreement included a visitation schedule, providing, among other things, that Child would spend three days and two nights per week during the school year, up to one-third of his lengthy school holidays, and an annual two-week summer vacation with Bennett. As to modifying the Agreement, the co-parents agreed, in relevant part, that they would "return to substantive conversation among [themselves] when [they] perceive that a change in situation for [Child] or any

4

of [the co-parents] calls for modification[,]" and the Agreement "shall be reviewed at least yearly, to maintain its appropriateness for [Child]." Finally, the co-parents agreed that Child's birth certificate would be modified to reflect that Demmon is Child's biological father.

{7} The Agreement was adopted by the court and entered as a stipulated order in October 2007. Mother and Bennett finalized their divorce in November 2008. The divorce decree stated that "[t]he parties share responsibility for [Child], whose care and disposition are addressed and ordered in the [Agreement.]"

{8} For almost three years, nothing was filed in the district court in regard to Child or in regard to the Agreement, and the parties were apparently meeting annually with a mediator to review the Agreement. In August 2010, Bennett filed a motion for an order to show cause in which he alleged that Mother and Demmon were "totally disregarding all parts of the Agreement." Three days later, Mother and Demmon filed a motion to modify the Agreement. Child was then seven years old.

{9} In their motion to modify, Mother and Demmon stated that the Agreement no longer served Child's best interest "in that . . . Bennett should not be included in decision making for [Child because] he does not comply with his agreements and he is not involved in [Child's] health care." It further stated that Child needed to spend more time with Mother and Demmon, that Bennett should not have a two-week

5

summer vacation with Child because "Bennett refuses to communicate with [Mother and Demmon] during the two[-]week period and virtually disappears with [Child]" and that "[d]uring the holidays, [Child] should spend more time with" Mother and Demmon. In response, Bennett moved the court to order the parties to participate in a child custody evaluation and to modify the Agreement to reflect the best interests of Child. At a hearing on Bennett's motion for an order to show cause, Bennett's attorney stated that the hearing was not required because Mother and Demmon agreed to comply with the Agreement until the matter of modifying the Agreement was resolved.

{10} The parties were ordered to mediation with the contingent order that if they could not reach an agreement in mediation, the case would proceed to a priority consultation and/or an advisory consultation. *See* NMSA 1978, § 40-12-3(A), (B) (1987) (" '[A]dvisory consultation' means a brief assessment about the parenting situation and a written report summarizing the information for the attorneys and the court, including an assessment by the counselor [who, by training or experience, is qualified to work with individuals in a mediation situation and to perform assessments] of the positions, situations[,] and relationships of family members and suggestions regarding specific plans, general issues[,] or requested action[.]"). The

parties attended a series of mediation sessions from March through June 2011, but ultimately, they were unable to reach an agreement.

{11}   In August 2011, Mother and Demmon filed a motion for an order to show cause detailing a dispute over Child's summer vacation with Bennett that ended with Bennett allegedly taking a seventeen-day vacation with Child, thereby exceeding the permissive vacation period by three days, and depriving Mother and Demmon of contact with Child during the vacation. In October 2011, the court held an evidentiary hearing on Mother's and Demmon's motion for an order to show cause. The court denied Mother's and Demmon's request to hold Bennett in contempt of court, reasoning that "both sides [had] violated the [A]greement" as it pertained to Child's summer schedule and that the violation that was the subject of the hearing was born of confusion rather than contempt for the court's order adopting the Agreement. At the conclusion of the hearing, the district court referred the parties to an advisory consultation, which the court described as "a process . . . that . . . is generally designed to maintain relationships and to promote those relationships going forward."

{12}   In January 2012, before the advisory consultation was held, Bennett filed a motion for an order to show cause against Mother and Demmon alleging that they violated the Agreement by unilaterally deciding to take and then taking Child on a trip over the Christmas-New Year's school vacation, thereby preventing Bennett's

visitation with Child. After an evidentiary hearing, the district court found that Mother and Demmon willfully violated the Agreement and held them to be in contempt of court. The court sanctioned Mother and Demmon by ordering them to pay Bennett's attorney fees related to his motion for an order to show cause; additionally, the court sentenced Mother and Demmon to fifteen days incarceration and suspended the sentence on the condition that they pay the sanction. Bennett's attorney's affidavit declared $3,015.73 in attorney fees, costs, and gross receipts tax. Over Mother's and Demmon's objection as to the sum, the court awarded the full amount as stated in the affidavit.

{13}    In April 2012, the advisory consultant filed an advisory consultation report (the report) and recommendations (the advisory recommendations). The report included background information regarding the parties and a synopsis of their respective concerns and issues, apparently gleaned from interviews with Bennett, Mother, and Demmon, and the advisory consultant's observations of the respective parties' interactions with Child. The consultant reported, based on her observation of Bennett and Child, that they had "a highly affectionate relationship[,]" and that Bennett attended to Child, engaged in a variety of play activities with Child, and answered Child's questions about the advisory consultation "in a neutral and appropriate fashion." The report also alluded to "[c]oncerns about [Bennett's] unwillingness to

8

set age-appropriate boundaries with" Child and suggestions, apparently from Mother and Demmon, that Bennett was perpetrating sexual abuse upon Child; however, a counselor who evaluated Child determined that there was no evidence of sexual abuse. Bennett had two adult sons from a former marriage. One of Bennett's adult sons reportedly spoke with the advisory consultant, and according to the advisory report, the adult son's "story indicate[d] that [Bennett] has a history of, at best, poor boundaries and, at worst, sexual deviance."

{14}    The advisory consultant recommended a significant reduction in Child's visitation with Bennett, among other things. The advisory recommendation also stated:

> Although [Mother, Demmon, and Bennett] filed [the Agreement] in 2007, specifying joint legal custody of [Child], [the A]greement has resulted in ongoing conflict between [Child's] biological parents and [Bennett]. It is therefore recommended that [Mother] and [Demmon] have sole legal custody of [Child]. [Mother] and [Demmon] make all decisions regarding [Child's] education, child care, health care, ongoing activities, residence[,] and religious upbringing.

{15}    Bennett filed an objection to a number of the advisory recommendations, in which, among other things, he attacked the advisory report's discussion of the allegations of improper sexual conduct. The district court held an evidentiary hearing on Bennett's objection to the advisory recommendations. Three witnesses testified at the evidentiary hearing, the advisory consultant, Dr. Priscilla Roberts; Rabbi Martin

9

William Levy, Child's ice skating coach; and Linda Besett, the principal of the elementary school that Child attended and at which Bennett was a volunteer and a substitute teacher.

{16}    In closing argument, Bennett's counsel requested that the court "lay to rest [the] allegations of sexually inappropriate behavior[,]" restore Bennett's visitation rights and, in sum, return "things back to where they were" in terms of co-parenting pursuant to the Agreement, but with a "clearly written document" pertaining particularly to Child's summer schedule. Mother's and Demmon's counsel, on the other hand, urged the court to implement the advisory recommendations. The court verbally issued its decision, partially adopting and partially modifying the advisory recommendations.

{17}    In relevant part, based on the witnesses' testimony, the court found that Child was bonded with three adults and that severing any of those relationships would be damaging to Child. The court determined that "[t]he question and the difficulty is, how [to] manage the interaction between the adults in a way that maximizes each of their abilities and opportunities to interact with [Child] so that he can grow and develop[.]" The court determined that there was not sufficient evidence to indicate that Bennett posed an inappropriate or sexual threat to Child, and ruled, further, that Bennett should have a more involved relationship with Child than what was stated in the advisory recommendations.

{18} Among other things, the court's ruling included the following. The court announced a modified schedule pertaining to Bennett's visitation with Child, and a modified vacation schedule, allowing Bennett one week of vacation with Child. As to decision-making authority, the court ruled that it would "maintain the status quo as to all of the current items within the school, the doctors, [and] activities. Neither the biological parents or . . . Bennett can change any of those without consulting the other party." After the court announced its ruling, the following exchange occurred between counsel for Mother and Demmon and the court.

Counsel: . . . I am assuming that the court is not awarding sole legal custody.

The court: That's correct.

Counsel: Okay. Is the court awarding joint legal custody[?]

The court: Joint legal custody to all three parties?

Counsel: Is that, . . . I just want the court's ruling on that[.]

The court: Yes.

In December 2012, the district court entered the parenting order memorializing its oral ruling that partially adopted and partially modified the advisory recommendations. Relevant aspects of the court's ruling will be discussed later in this Opinion.

{19} Mother and Demmon appeal from the parenting order, arguing that the district court erred in awarding joint legal custody to a third party in addition to Child's

biological mother and father. Additionally, they appeal the court's orders holding them in contempt of court (the contempt order) and requiring them to pay Bennett's attorney fees related to the contempt proceedings. Mother and Demmon argue that the contempt order exemplified an abuse of power and an abuse of the court's discretion and that the court erred by awarding fees that were not incurred in connection with the contempt proceedings.

{20} We conclude that Mother's and Demmon's argument in regard to the parenting order raises constitutional and other issues beyond the scope of what was raised before and considered by the district court. Limiting our review to the propriety of the court's partial adoption and partial modification of the advisory recommendations to modify the Agreement, we conclude that nothing in the district court's order warrants reversal. Further, we conclude that the contempt order and its order awarding attorney fees do not warrant reversal. We affirm.

**DISCUSSION**

**I.      Standard of Review**

{21} The district court has "wide discretion in determining custody and designing parenting plans, including visitation arrangements." *Rhinehart v. Nowlin*, 1990-NMCA-136, ¶ 25, 111 N.M. 319, 805 P.2d 88. Likewise, the district court has "the power and authority to execute, modify[,] or vacate any order involving the

12

guardianship, care, custody, maintenance[,] and education of minor children." *Id.* ¶ 14 (emphasis omitted). A child's best interest is the paramount consideration in such matters. *Id.* ¶ 24. We will not conclude that the district court abused its discretion unless the court's ruling was "clearly against logic and the effect of facts and circumstances." *Id.* ¶ 47.

{22} This Court reviews a civil contempt order for sufficiency of the evidence to support the finding of contempt, and we review the award of attorney fees incurred as a result of the contempt for an abuse of discretion. *Id.* ¶¶ 30, 34. Finally, to the extent that this appeal raises constitutional issues or issues of statutory interpretation, our review is de novo. *See Bank of N.Y. v. Romero*, 2014-NMSC-007, ¶ 52, 320 P.3d 1.

**II.    The Parenting Order Issue**

{23} On appeal, Mother and Demmon argue that Bennett is not Child's "parent" under the New Mexico Uniform Parentage Act, NMSA 1978, §§ 40-11A-101 to -903 (2009), and that he is not a "de facto parent," an "equitable parent," or a "parent" under the terms of the Agreement. They also argue that the district court erred in failing to apply the parental preference doctrine. Based on our review of the record and particularly the transcript of the hearing on Bennett's objection to the advisory recommendations, we conclude that Mother and Demmon failed to preserve for this

13

Court's review any issue relating to whether Bennett was Child's "parent" under the New Mexico Uniform Parentage Act or whether he was a de facto parent, an equitable parent, or a parent under the Agreement. Nor did Mother and Demmon preserve their argument, raised on appeal, regarding the applicability of the parental preference doctrine. *See Woolwine v. Furr's, Inc.*, 1987-NMCA-133, ¶ 20, 106 N.M. 492, 745 P.2d 717 ("To preserve an issue for review on appeal, it must appear that [the] appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court.").

{24} The hearing on Bennett's objection to the advisory recommendations was framed by Bennett as being "essentially a hearing for modification of a [p]arenting [p]lan." Mother and Demmon did not object to Bennett's statement of the issue to be considered at the hearing, and it is clear from the transcript that the parties and the court treated the issue as one regarding the propriety of the advisory consultant's recommended modifications to the Agreement. Moreover, it is clear from the record that the district court recognized that Mother and Demmon and Bennett were Child's "co-parents" pursuant to the Agreement.

{25} Although we observe that in her opening statement at the hearing on Bennett's objection to the advisory recommendations, Mother's and Demmon's counsel discussed her belief that Bennett lacked custodial rights or parental standing, counsel

14

stated that those comments were intended to provide a "legal basis for . . . some of the recommendations." And, in response to the district court's question whether the Agreement created a parent-child relationship, counsel responded that she did not know, but that she did not believe it did. She continued, however, by stating that "even though [Bennett] may not have . . . standing . . . [t]here is a relationship between [him] and [Child]. And [Mother and Demmon] are not wanting to cut it off. They might have legal grounds to do so. I'm not saying they do or they don't. But it's a possibility they would. However, that would not be in [Child's] best interest[.]"

{26} We do not view Mother's and Demmon's counsel's opening comments as an invocation of a ruling that the Agreement's provision that the parties were Child's co-parents was legally invalid. To the extent that counsel was caught off guard by the court's question regarding the effect of the Agreement or was not immediately prepared to respond, we see no reason that counsel did not later attempt, either by oral argument at the second day of the two-day hearing, by filing a written motion, or by filing a motion to reconsider, to provide an answer to the court's question, and/or to invoke a ruling on the question whether Bennett was a "parent" pursuant to the Agreement.

{27} In sum, we conclude that in light of the Agreement's provision that the parties were Child's "co-parents," a designation agreed to by the parties and adopted by court

order in 2007, Mother's and Demmon's failure to invoke a ruling on the legality of Bennett's status as Child's "parent" precludes review of that issue in the present appeal. *See id.* (stating the preservation requirement). Accordingly, we limit our review to the propriety of the parenting order.

{28} In effect, the parenting order, which partially rejected and partially modified the advisory recommendations, constituted a modified version of the parenting plan and visitation schedule that was already in effect pursuant to the Agreement. Thus, in our review of the parenting order, we are mindful that the district court was vested with wide discretion in making changes that were within Child's best interest. *See Rhinehart*, 1990-NMCA-136, ¶ 25 (recognizing the court's "wide discretion in . . . designing parenting plans, including visitation arrangements").

{29} We begin our discussion of Mother's and Demmon's argument regarding the parenting order by rejecting the notion that the parenting order established joint custody between Bennett and Mother and Demmon. Relying on the premise that the Agreement did not endow Bennett with legal custody, Mother and Demmon argue that the district court erred in awarding joint legal custody to Mother and Demmon and Bennett in the parenting order, where no such custody order previously existed. The Agreement, however, supports a view that the matter of joint custody between Bennett

16

and Mother and Demmon was established in the 2007 order adopting the Agreement.

{30} The Agreement provides that the three co-parents were entitled, among other things, to share decision making "related to [Child's] health and education[,]" that they would "stay in communication regarding [Child] and his needs, especially concerning his immediate and long-term health needs[,]" and that Child's time would be divided between the two households. Thus, although the Agreement did not use the term "legal custody," the Agreement reflects that what was agreed upon by the parties and ordered by the court had the attributes of shared legal custody. *See* NMSA 1978, § 32A-1-4(O) (2009) (defining "legal custody" in the context of the Children's Code, NMSA 1978, §§ 32A-1-1 to -24-5 (1993, as amended through 2013), as "a legal status created by order of the court" that vests a person with, among other things, the right "to provide the child with food, shelter, personal care, education[,] and ordinary and emergency medical care"; and "the right to consent to major medical . . . treatment").

{31} Furthermore, it appears from the record in this case that both the court and the advisory consultant viewed the Agreement as having established joint legal custody. We observe that the advisory recommendations stated, in relevant part, that the Agreement, filed in 2007, "specifi[ed] joint legal custody of [Child]" among Mother

17

and Demmon and Bennett. Mother and Demmon did not attempt to refute that observation in requesting that the court adopt the advisory recommendations. And we further observe that the district court stated that, in regard to decision-making authority, it would "maintain the status quo[,]" meaning that neither Mother and Demmon nor Bennett could make changes to Child's "school, . . . doctors, [or] activities" without consulting the other party, and only when further prompted, in regard to its ruling, did the court specify that it was not awarding sole legal custody to Mother and Demmon. We interpret the district court's "status quo" comment as reflecting its holding that, contrary to the advisory recommendations, the legal custody arrangement established in the Agreement would not be modified.

**{32}** Because shared legal custody was established by the Agreement, the court should only have adopted the advisory recommendation to grant sole legal custody to Mother and Demmon if they demonstrated that such a change was required by a change in circumstances or was otherwise within Child's best interest. *See Grant v. Cumiford*, 2005-NMCA-058, ¶ 13, 137 N.M. 485, 112 P.3d 1142 ("[A] court may modify a custody order only upon a showing of a substantial change in circumstances since the prior order that affects the best interests of the [child]." (internal quotation marks and citation omitted)). The question of what is within a child's best interest is a matter within the district court's discretion. *See State ex rel. Children, Youth &*

*Families Dep't v. Senaida C.*, 2008-NMCA-007, ¶ 9, 143 N.M. 335, 176 P.3d 324 (stating that a best-interest determination in the context of a custody arrangement is within the district court's discretion).

{33} Mother and Demmon argue that the district court failed to consider Child's best interest in rendering its parenting order. Specifically, relying on the advisory consultant's testimony, Mother and Demmon argue that Child's best interest would be served by granting sole legal custody to Mother and Demmon, thereby allowing them to make all of the decisions regarding Child, rather than continuing to allow three adults to make joint decisions about Child's life. Because the court's decision was supported by substantial evidence at the hearing on Bennett's objection to the advisory recommendations, we are not persuaded by Mother's and Demmon's argument.

{34} Considering the peculiar facts of this case, the court announced that it would be appropriate for Bennett to have a "more involved relationship with [Child] than was recommended by the [advisory] consultant[.]" The court reasoned that Child was bonded with three adults and that severing any of those relationships would be damaging to him. The court further reasoned that "[t]he question and the difficulty is, how do we manage the interaction between the adults in a way that maximizes each of their abilities and opportunities to interact with [Child] so that he can grow and

19

develop to be everything that all three [co-parents] hope he is." Against that backdrop, the court proceeded to announce its order modifying the co-parents' respective schedules in regard to Child and rejecting the advisory recommendation to grant sole legal custody to Mother and Demmon.

{35} We do not believe that it would be useful to detail the testimony at the hearing on Bennett's objection to the advisory recommendations. Having reviewed both the advisory report and testimony presented at the hearing from witnesses who had observed Child's relationship and interactions with Bennett, we conclude that they provided a substantial factual basis to support the district court's conclusion that Child and Bennett were bonded and had a healthy and appropriate relationship. *See Thomas v. Thomas*, 1999-NMCA-135, ¶ 10, 128 N.M. 177, 991 P.2d 7 (stating that we will uphold the district court's findings related to the modification of a custody arrangement if they are supported by substantial evidence).

{36} In attempting to refute the court's best-interest determination, Mother and Demmon point to the fact that the advisory report discussed the conflict between the co-parents as causing Child to feel "caught in the middle" and that Child wished that his parents would stop fighting over him. They also point to the advisory report's notation that "[c]hild development research shows that it is the on-going conflict between divorced parents . . . that puts [Child] at high risk for serious problems in

20

later life." Although these facts support Mother's and Demmon's view, viewing them in the context of the entire body of evidence before the district court, including aspects of the advisory report that reflected the positive nature of Bennett's relationship with Child, we are not persuaded that this argument warrants reversal of the district court's ruling. *See Mayeux v. Winder*, 2006-NMCA-028, ¶ 32, 139 N.M. 235, 131 P.3d 85 (stating that in reviewing a discretionary decision, we will not substitute our judgment for that of the district court). Moreover, as stated earlier, the district court did not overlook the issue of the co-parents' interaction; instead, the court specifically observed that the issue of the co-parents' interaction was an obvious concern. In terms of that concern, it appears from the court's ruling that by implementing a visitation and vacation schedule with clear and definitive parameters, the court sought to reduce the contentious nature of the co-parents' relationship.

{37} In sum, having reviewed the court's ruling and the evidence at the hearing, we cannot conclude that the court abused its discretion in partially rejecting and partially modifying the advisory recommendations in keeping with its view of what was in Child's best interest. *See Rhinehart*, 1990-NMCA-136, ¶¶ 24, 47 (stating that we will not hold that a court abused its discretion unless its ruling was "clearly against logic and the effect of facts and circumstances" and recognizing that a child's best interest is the paramount consideration). Nor do we conclude that Mother and Demmon

21

presented evidence of a substantial change in circumstances that required the district court to discontinue joint legal custody. *See Grant*, 2005-NMCA-058, ¶ 13 (stating the circumstances under which a custody agreement should be modified). Mother's and Demmon's arguments do not provide a persuasive basis for reversing the parenting order.

{38}    Finally, in regard to the parenting order, Mother and Demmon argue that their fundamental right to raise Child was violated by the court's order. *See Gutierrez v. Connick*, 2004-NMCA-017, ¶ 16, 135 N.M. 272, 87 P.3d 552 (recognizing that parents have the fundamental right to make child-rearing decisions and that the state may not infringe on that right merely "because a state judge believes a better decision could be made" (internal quotation marks and citation omitted)). Mother and Demmon acknowledge that they failed to preserve this issue in the district court, yet they ask that we exercise our discretion to address it insofar as a fundamental interest is at stake. *See* Rule 12-216(B)(2) NMRA (stating that the appellate courts have discretion to consider unpreserved issues involving the fundamental rights of a party).

{39}    Because Mother's and Demmon's due process argument is a continuation of their argument that, unlike the Agreement, the parenting order vested Bennett with custody, we decline to consider it further. As discussed earlier in this Opinion, the parenting order effectively modified the terms of the co-parenting arrangement

established by the parties in the Agreement. The parenting order did not deprive Mother and Demmon of custody of Child, nor, as Mother and Demmon now contend, did it award legal custody to "a third party." To the contrary, it maintained the status quo in regard to the legal custody arrangement established by the Agreement in 2007. This is not a circumstance in which the state or a state actor infringed on the fundamental right of Mother and Demmon to raise Child.

**III.    The Contempt and Attorney Fees Issue**

{40}    Pursuant to the Agreement, Bennett's regular visitation with Child extended from Thursday afternoon to Saturday afternoon, but during "lengthy school holidays" he was to have one "additional day per week . . . not exceeding one-third of the total holiday period" with Child. The contempt proceedings at issue here centered on the fact that Mother and Demmon took Child on a vacation over Child's winter break in 2011, without first discussing their plans with Bennett. The vacation interfered with Bennett's visitation.

{41}    Mother and Demmon argue that the district court erred in holding them in contempt and awarding attorney fees as a sanction. Relying on *Rhinehart*, 1990-NMCA-136, ¶ 30, Mother and Demmon argue that "[t]o hold a party in civil contempt, there must be evidence of: (1) knowledge of the court's order[,] (2) ability to comply[,] and (3) willful noncompliance with the order." Mother's and Demmon's

23

reliance on *Rhinehart* for the civil contempt standard is misplaced. As this Court clarified in *Spear v. McDermott*, "willfulness or intent is not an element of a civil contempt action." 1996-NMCA-048, ¶ 41, 121 N.M. 609, 916 P.2d 228 (observing that *Rhinehart* followed the erroneous standard). Nevertheless, because the district court also appears to have considered the willfulness of the violation in rendering its decision, we consider Mother's and Demmon's argument under the *Rhinehart* standard.

**{42}** Mother's and Demmon's argument appears to attack the sufficiency of the evidence supporting the court's finding of willful noncompliance with the court's order. *See Rhinehart*, 1990-NMCA-136, ¶ 30 (stating the elements of contempt). Specifically, Mother and Demmon argue that because Demmon testified at the contempt hearing that he attempted to make up for or "accommodate" the lost visitation by allowing Bennett to spend an extra day with Child during the week prior to the vacation, the violation was not willful. In addition to the foregoing testimony, however, Demmon also testified at the contempt hearing that he was familiar with the relevant provision of the Agreement before he booked the winter break vacation. Demmon further acknowledged that the Agreement controlled Bennett's visitation with Child and that the Agreement did not state that Mother and Demmon could take Child on vacation during winter break.

{43} The district court found that Mother and Demmon "knowingly and willfully violated [the Agreement] by taking [Child] on vacation when the [Agreement] provided [Bennett] visitation rights during the time they were gone." Based on Demmon's testimony that he was familiar with the Agreement's provisions, we conclude that evidence at the contempt hearing supported the district court's finding of a willful violation of the Agreement. *Cf. Thornfield v. First State Bank of Rio Rancho*, 1983-NMCA-149, ¶ 7, 103 N.M. 229, 704 P.2d 1105 (defining "willfulness" in the context of failing to comply with a discovery order as "any conscious or intentional failure to comply[,]" but "no wrongful intent need be shown to make such a failure willful" (internal quotation marks and citation omitted)).

{44} Mother and Demmon argue that even if this Court concludes that the district court's decision to hold Mother and Demmon in contempt was legally sound, the court's order awarding Bennett's attorney fees should be reversed. Although they acknowledge that the district court may impose sanctions for contempt by awarding the aggrieved party his or her attorney fees and costs, they argue that the district court erred in awarding fees that were incurred prior to the contempt proceedings. *See Rhinehart*, 1990-NMCA-136, ¶ 28 (recognizing that courts may impose attorney fees as sanctions in a contempt proceeding). Mother and Demmon note that they objected in district court to certain fees contained in Bennett's trial counsel's affidavit, but on

appeal they do not develop an argument demonstrating why the court erred in awarding the fees over their objection. We will not attempt to develop the argument for them. *See Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 (stating that an appellate court "will not review unclear arguments[] or guess at what a party's arguments might be" (alteration, internal quotation marks, and citation omitted)). Mother and Demmon have provided no basis for this Court to conclude that the district court abused its discretion in awarding the fees.

**CONCLUSION**

{45}    For the foregoing reasons, we affirm the district court .

{46}    **IT IS SO ORDERED.**

_____
                          **JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____
**RODERICK T. KENNEDY, Chief Judge**

_____
**M. MONICA ZAMORA, Judge**