This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                          **NO. 32,992**

**GUILLERMO RUIZ,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**James Waylon Counts, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Adam Greenwood, Assistant Attorney General
Albuquerque, NM

for Appellee

Jorge A. Alvarado, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**VANZI, Judge.**

{1}    Defendant Guillermo Ruiz killed Anabel Calzada Alvarado (Victim) in Ruidoso and then wrapped her body in a blanket and burned it in Juarez, Mexico. Defendant was convicted of second degree murder and tampering with evidence and now appeals. Defendant argues that (1) the district court erred in finding him competent to stand trial and in refusing to submit the issue of competency to the trial jury; (2) prosecutorial misconduct at closing argument requires reversal; and (3) the conviction for tampering with evidence was based on insufficient evidence. We affirm. Because this is a memorandum opinion and because the parties are familiar with the case, we reserve discussion of the facts for our analysis of the issues on appeal.

**DISCUSSION**

**Competency to Stand Trial**

{2}    "It is a violation of due process to prosecute a defendant who is incompetent to stand trial." *State v. Flores*, 2005-NMCA-135, ¶ 16, 138 N.M. 636, 124 P.3d 1175 (alteration, internal quotation marks, and citation omitted). A defendant is competent to stand trial when he (1) understands the nature and significance of the criminal proceedings against him, (2) has a factual understanding of the criminal charges, and (3) is able to assist his attorney in his defense. *State v. Chapman*, 1986-NMSC-037, ¶ 14, 104 N.M. 324, 721 P.2d 392.

{3}    Rule 5-602(B)(2) NMRA provides that a defendant's competency is determined by the judge, "unless the judge finds there is evidence which raises a reasonable

doubt" about the issue. In cases where a reasonable doubt is raised prior to trial, "the court shall order the defendant to be evaluated as provided by law." Rule 5-602(B)(2)(a). After the evaluation, "the court, without a jury, may determine the issue of competency to stand trial; or, in its discretion, may submit the issue . . . to a jury[.]" *Id.* When the issue of competency is raised again at trial, we have previously held that the district court need not submit the issue to the jury in the absence of new evidence sufficient to create a reasonable doubt. *State v. Rael*, 2008-NMCA-067, ¶¶ 22-23, 25, 144 N.M. 170, 184 P.3d 1064.

{4}     Defendant makes two arguments related to competency on appeal: (1) that the district court erred in refusing to submit the issue to a jury, and (2) that the district court erred in finding Defendant competent to stand trial. Defendant argues that the standards of review that we apply to these two issues differ—specifically, that we should apply something less deferential than an abuse of discretion standard to the substantive competency question.

{5}     However, the appropriate standards are well settled. The defendant ultimately bears the burden of proving that he is incompetent by a preponderance of the evidence. *See State v. Chavez*, 2008-NMSC-001, ¶ 11, 143 N.M. 205, 174 P.3d 988. "If the district court finds reasonable doubt as to competency, the issue is submitted to a jury." *Rael*, 2008-NMCA-067, ¶ 6. We review both a district court's decision not to send the issue to the jury and its substantive competency determination for an abuse

3

of discretion. *State v. Lopez*, 1978-NMSC-060, ¶¶ 5-6, 91 N.M. 779, 581 P.2d 872; *Rael*, 2008-NMCA-067, ¶ 6; *State v. Garcia*, 2000-NMCA-014, ¶ 20, 128 N.M. 721, 998 P.2d 186. In fact, as a logical matter, the inquiries in this case are one and the same. If there was no reasonable doubt as to Defendant's competency to stand trial, then there can be no preponderance of the evidence to the contrary, and "there is no question for a jury to decide." *State v. Noble*, 1977-NMSC-031, ¶ 7, 90 N.M. 360, 563 P.2d 1153.

{6}     The record reflects a long, deliberate attempt by all involved to ascertain and ensure Defendant's competency. In accordance with Rule 5-602(B)(2), the court twice committed Defendant to the New Mexico Behavioral Health Institute (NMBHI) for evaluation and treatment. The first transfer to NMBHI was ordered after defense counsel asked Dr. Eric Westfried to evaluate Defendant's mental state for the purpose of ascertaining Defendant's capacity to form intent. Dr. Westfried conducted clinical and forensic interviews of Defendant, who reported that he was traumatized by prior emotional and sexual abuse that he experienced as a teenager at an adolescent treatment program. Dr. Westfried conducted a battery of tests on Defendant, interviewed Defendant's sister, and reviewed court records and prior mental health records, ultimately concluding that Defendant had a twenty-year history of "what has been diagnosed as post-traumatic stress disorder" (PTSD) and "he probably has a schizophrenia disorder." The findings in the Westfried evaluation prompted the court

4

to consign Defendant to NMBHI, where he was under "close observation" for several months.

{7}     During his commitment at NMBHI, Defendant was evaluated on eight occasions by Dr. Gina Bettica. Dr. Bettica reviewed Dr. Westfried's report and administered hours of clinical interviews and psychological testing geared specifically to ascertain Defendant's competency to stand trial. According to Dr. Bettica, Defendant "demonstrated a good understanding and appreciation" of his pending charges. He understood that he faced felony-level offenses and recognized the differences between felonies and misdemeanors and between degrees of felonies. Defendant understood the consequences of a conviction and was aware of the penalties he faced. He also understood general conditions of probation, and he knew that a not guilty verdict means that "charges are dismissed and that defendants go home." Defendant recognized the difference between a bench trial and a jury trial; he understood the roles of the major courtroom personnel; he understood the basics of sentencing; and he "evidenced an adequate understanding and appreciation of the possible pleas he [could] enter" and of the plea agreement process generally.

{8}     Dr. Bettica also concluded that Defendant possessed the basic capacity to assist in his own defense. He knew who his attorney was and generally understood attorney-client privilege. Defendant was familiar with courtroom decorum and demonstrated

5

the ability to "maintain appropriate levels of attention during the proceedings," especially if reminded to focus during important proceedings by his attorney.

{9}     Dr. Bettica and other NMBHI personnel disagreed with Dr. Westfried's findings related to PTSD and schizophrenia disorder. Dr. Bettica diagnosed Defendant with a general personality disorder because his symptoms "were atypical of patients with [PTSD] and because he responded to diagnostic testing specific to [PTSD] in a less than forthright manner." Similarly, Dr. Djillali Boudjenah, a psychiatrist, and Dr. Mary Weiss, a psychiatry resident, both reported that Defendant's symptoms were inconsistent with PTSD, diagnosing him instead with a general mood disorder. They noted that Defendant's self-report of distress was "not corroborated by observation of him on the unit[.]"

{10}     After Defendant's discharge from NMBHI, defense counsel referred Defendant back to Dr. Westfried for an independent competency evaluation. Dr. Westfried reviewed the Bettica report and conducted an additional six hours of clinical and forensic interviews and psychological testing of Defendant at the Otero County Detention Center. Dr. Westfried agreed with Dr. Bettica that Defendant had "an adequate basic understanding of the roles of courtroom participants, available pleas including forfeited rights involved in a plea agreement, and the concept of proportionality as it is applied to severity of offense and consequences." However, Dr. Westfried found that Defendant was not competent to proceed to trial because he had

6

no rational perspective on his own case and would be unable to assist in his own defense. "Although he has the knowledge to understand his charges and how the legal system works in a case like his," Dr. Westfried stated, "he is unable at the present time to rationally use those abilities due to his [PTSD]." Dr. Westfried predicted that Defendant would not accept a plea and that he would instead argue to the jury that Victim's death was a result of the mistreatment he suffered as a teenager at the adolescent youth program. Dr. Westfried also noted that Defendant reported that "he [would] kill himself" if not acquitted of the murder charge.

{11} Faced with conflicting reports related to Defendant's ability to assist in his own defense, the district court again committed Defendant to NMBHI for treatment to ascertain competency. This time, Defendant was uncooperative with clinicians and hospital staff. According to Dr. Douglas Davis, who issued the final forensic report, Defendant's stay was "notable for his secrecy, refusals to engage in testing and treatment, and attempts to manipulate and control staff and procedures and thereby get his way." Because of this, Dr. Davis's findings relied primarily on two-and-a-half months of "24-hour behavioral observations by unit staff[,]" and only minimal psychological testing.

{12} Dr. Davis, like Dr. Bettica, Dr. Boudjenah, and Dr. Weiss before him, disputed Dr. Westfried's conclusion that Defendant suffered from PTSD. According to Dr. Davis, "No one who saw [Defendant] in the forensic unit after he was charged,

7

including two psychologists, the acting chief of psychiatry, two staff psychiatrists, a nurse practitioner, and a [fourth]-year psychiatry resident, believed that he had PTSD." The Davis report strongly suggested that Defendant was exaggerating his symptoms: "[H]e was evasive, petulant, manipulative, and self-serving. He threatened to 'get suicidal' if he did not get his way." Dr. Davis noted that Defendant was "goal-directed" and frequently wanted to review what was being written about him. Other clinicians corroborated these findings, recognizing Defendant's deceitfulness and "volitional" refusal to participate in clinical evaluation. Dr. Davis ultimately diagnosed Defendant with a psychotic disorder but found that his condition did not impair his present competency. He concluded that Defendant's behavior on the unit

> suggested a man with few scruples and much to hide, features more typically associated with personality disorders than mental illness. Whether he does or does not have much to hide is not at issue, but given the stakes, he is right to watch what he says and does, and wise to worry about what others write, think, and say about him. Considering his situation, such thinking and behavior are reasoned, self-protective, and in his best interest. That is, they are rational. . . . [Defendant] precisely understands and fully appreciates his legal situation. He is competent to stand trial and enter a plea.

{13}     On June 22, 2012—over four years after Dr. Westfried conducted the first evaluation of Defendant—the district court held a competency hearing to consider the conflicting evidence. Defense counsel told the court that representing Defendant had been "a long arduous situation" and an "impossible task." Defense counsel reported that the attorneys had designed a plea agreement that was "the appropriate resolution"

8

but that Defendant instead desired to proceed to trial and testify to the jury about the abuse he experienced as a teenager.

{14} Dr. Westfried and Dr. Davis both testified at the hearing. Their testimony largely mirrored their reports, although Dr. Westfried referred to the rejected plea agreement mentioned by defense counsel. Dr. Westfried described the agreement as a "reasonable offer . . . that would reduce [Defendant's] exposure by half, if not more." He opined that Defendant's decision to proceed to trial to assert an insanity defense based on his mistreatment as a teenager would only "aggravate the catastrophe of the situation."

{15} Both experts agreed that Defendant was manipulative and difficult to work with. No evidence was presented that Defendant failed to understand either the criminal proceedings or the charges against him. The gist of the evidence was that Defendant was not cooperating with counsel. As the district court recognized, the question before the court was whether that was "a choice that ha[d] been made," or whether Defendant "lack[ed] the capacity to make that choice." The court ultimately concluded that Defendant was "able to assist his attorney in his defense, even though . . . he ha[d] chosen not to take his attorney's advice."

{16} On appeal, this issue is resolved by the unremarkable rule that "[t]he reviewing court cannot substitute its judgment for that of the trial court[,]" *Lopez*, 1978-NMSC-060, ¶ 6, even when the determination below required a finding of competency beyond

a reasonable doubt. *State v. Montano*, 1979-NMCA-101, ¶¶ 12-14, 93 N.M. 436, 601 P.2d 69 (rejecting the argument that conflicting expert testimony forecloses the trial court from ruling that there is no reasonable doubt as to competency). "Viewing the evidence," as we must, "in the light most favorable to the trial court's decision," *Lopez*, 1978-NMSC-060, ¶ 7, we hold that the district court did not abuse its discretion when it credited the views of Defendant's competency expressed by Dr. Davis, Dr. Bettica, and the other clinicians referenced in the NMBHI reports. *See Grant v. Cumiford*, 2005-NMCA-058, ¶ 13, 137 N.M. 485, 112 P.3d 1142 ("When there exist reasons both supporting and detracting from a trial court decision, there is no abuse of discretion." (internal quotation marks and citation omitted)). As we have shown, these views were based on extensive clinical and forensic interviews, psychological testing, and months of observation of Defendant at NMBHI.

{17}     The argument to the contrary, which relied largely on Defendant's seemingly irrational refusal to accept what defense counsel and its witness believed to be a beneficial plea, is not so airtight that it would be an abuse of discretion for the district court to reject it. An entirely competent defendant may choose to have his fate decided by a jury of his peers, even when doing so seems unreasonable to those who do not stand in the defendant's shoes. We affirm both the district court's decision that competency was established beyond a reasonable doubt and its subsequent decision not to relitigate the same issue when the defense raised it again on the day of trial

10

without bringing forth any new evidence. *See Rael*, 2008-NMCA-067, ¶ 22 (holding that the reasonable doubt requirement "is implied" under Rule 5-602(B)(2)(b) when the issue of competency is re-raised at trial).

**Prosecutorial Misconduct**

{18}    Defendant next argues that prosecutorial misconduct at closing argument requires reversal. He argues first that the State incited the passion of the jury by calling Defendant "a cold[-]blooded manipulating calculated killer" and by asking the jury to find Defendant guilty for Victim; and second, that the State misstated the law when it implied that Defendant would go free if found not guilty by reason of insanity. Defendant also contends that the district court erred in refusing a proposed instruction to cure the latter statement. The State counters that Defendant takes the prosecutor's words out of context and that the statements do not require reversal, either individually or combined.

{19}    In closing argument, it is improper for a prosecutor to "misstate the law" to the jury, *State v. Diaz*, 1983-NMCA-091, ¶ 18, 100 N.M. 210, 668 P.2d 326, or to comment on the veracity of a witness in a way that is intended to "incite the passion of the jury." *State v. Aguilar*, 1994-NMSC-046, ¶ 22, 117 N.M. 501, 873 P.2d 247 (internal quotation marks and citation omitted). However, "[t]he trial court has broad discretion in controlling the conduct and remedying the errors of counsel during trial. An appellate court reviews comments made in closing argument in the context in

11

which they occurred so as to gain full appreciation of the comments and their potential effect on the jury." *State v. Estrada*, 2001-NMCA-034, ¶ 24, 130 N.M. 358, 24 P.3d 793 (internal quotation marks and citations omitted). "If the prosecutor's closing comments were inappropriate, [the d]efendant must show that the comments were prejudicial and prevented him from receiving a fair trial in order to prevail on appeal." *State v. Sellers*, 1994-NMCA-053, ¶ 20, 117 N.M. 644, 875 P.2d 400.

{20}  Our Supreme Court has discerned three factors relevant to the analysis:

> (1) whether the statement invades some distinct constitutional protection; (2) whether the statement is isolated and brief, or repeated and pervasive; and (3) whether the statement is invited by the defense. In applying these factors, the statements must be evaluated objectively in the context of the prosecutor's broader argument and the trial as a whole.

*State v. Sosa*, 2009-NMSC-056, ¶ 26, 147 N.M. 351, 223 P.3d 348.

{21}  The trial in this case lasted six days. The State's theory was that Defendant committed first degree murder and that the underlying felony was attempted criminal sexual penetration. Defendant admitted that he killed Victim but disputed any allegations of rape or attempted rape. He told the jury that Victim was evil, that he "[saw] her distorted[,]" and that he could not control himself when he stabbed her to death. He testified at length about his history of abuse at the adolescent treatment program and the effects it had on his physical and mental health. At one point he told the jury that he was "better than God." He stated that he should take God's place.

{22} Thus, the primary disputes for the jury to resolve were related to (1) Defendant's state of mind at the time of the killing, and (2) whether Defendant committed the underlying felony of criminal sexual penetration, which was necessary to support the first degree murder charge. Defense counsel's closing comments centered on these two issues. Specifically, defense counsel argued that the State presented no evidence to contradict Defendant's testimony that he never attempted to rape Victim. The defense further emphasized that the killing resulted entirely from Defendant's "moral insanity" brought about in part by Defendant's history of abuse. Defendant, according to defense counsel, "was unable . . . to understand the consequences of his actions. . . . He is insane in thinking that the moral consequences [did not] concern him. He was unaware of them because he was God."

{23} In response, the prosecutor attacked Defendant's veracity as a witness for ten straight minutes during rebuttal closing. He alluded to expert testimony that Defendant suffered from a personality disorder (narcissism) rather than mental illness. The prosecutor argued that Defendant was a biased witness, that he wanted the jury "to think he's crazy[,]" and that, consistent with his narcissism, he would act in his own self-interest, exploiting the insanity defense because it benefitted him. He then stated that Defendant "wants to walk away from this case. He wants to walk away and not take responsibility. He wants to be free." He called Defendant "a cold-blooded,

13

manipulating, calculated killer," and he asked the jury to find Defendant guilty of first degree murder for Victim.

**{24}** We conclude that the statements complained of did not prevent Defendant from receiving a fair trial. We are cognizant that "attorneys are afforded reasonable latitude in their closing statements, and rebuttal in particular is responsive and not always capable of the precision that goes into prepared remarks." *State v. Ramos-Arenas*, 2012-NMCA-117, ¶ 17, 290 P.3d 733 (internal quotation marks and citation omitted). The comments, while strongly worded, do not appear to have been intended to arouse the prejudices of the jury, but rather to punctuate a point that was supported by evidence and very much in dispute: that Defendant—suffering from narcissism and not PTSD or schizophrenia—killed Victim in cold blood during an attempted rape, and then feigned his insanity to escape the consequences of his actions. *See Sosa*, 2009-NMSC-056, ¶ 34 ("[C]ontext is paramount.").

**{25}** Within this context, the *Sosa* factors, discussed above, do not point to reversal. The specific statements that Defendant "want[ed] to walk away from this case" and that Defendant was "a cold-blooded, manipulating, calculated killer" were isolated comments, unrelated to any distinct constitutional protection, framed within a broad argument about the insanity defense and about Defendant's credibility as a witness. *See id.* ¶ 31 ("[O]ur appellate courts have consistently upheld convictions where a prosecutor's impermissible comments are brief or isolated."). The prosecutor's

14

comments were both central to the State's theory at trial and invited by defense counsel's closing statement that Defendant was unaware of his actions because "he was God." *See id.* ¶ 33 ("[W]e are least likely to find error where the defense has 'opened the door' to the prosecutor's comments by its own argument.").

{26}     It is also unlikely that the alleged misconduct had an effect on the outcome of the trial. *Sellers*, 1994-NMCA-053, ¶ 20 ("[The d]efendant must show that the comments were prejudicial."). By all appearances, the jury took seriously its charge to determine the facts from the evidence produced in court, rather than sympathy or prejudice. Far from being prejudiced by the prosecutor's arguably improper request that it find Defendant guilty of first degree murder for Victim, the jury acquitted Defendant of both first degree murder and of attempted criminal sexual penetration. "[T]he common thread running through the cases finding reversible error is that the prosecutors' comments materially altered the trial or likely confused the jury by distorting the evidence, and thereby deprived the accused of a fair trial." *Sosa*, 2009-NMSC-056, ¶ 34. There is no indication of any such deprivation here.

{27}     Defendant argues that the comment that Defendant "wants to go free" was intended to mislead the jury into thinking that Defendant would go free if the jury accepted his insanity defense. He contends that his request for a curative instruction was improperly denied. While curative instructions can offset the prejudicial effect of erroneous statements made during closing argument, Defendant's only proposed

15

instruction was itself an improper instruction on the consequences of a jury verdict. *See id.* ¶ 25. "[I]nstructions regarding the consequences of a verdict generally are not given. In fact, the jury is expressly admonished *not* to consider the consequences of its verdict. An instruction on the consequences of a verdict of not guilty by reason of insanity would present an irrelevant issue to the jury." *State v. Neely*, 1991-NMSC-087, ¶ 29, 112 N.M. 702, 819 P.2d 249 (citations omitted). The only appropriate instruction to cure the prosecutor's comment that Defendant "wants to be free" was given to the jury on multiple occasions by the State and the court: "You must not concern yourself with the consequences of your verdict." We presume that the jury followed that instruction "and did not rely for its verdict on one very brief part of the [s]tate's closing remarks." *State v. Armendarez*, 1992-NMSC-012, ¶ 13, 113 N.M. 335, 825 P.2d 1245. For all of these reasons, we conclude that statements made by the prosecutor during rebuttal closing argument do not require reversal.

**The Conviction for Tampering With Evidence**

{28}     Defendant's final argument is that the State failed to present sufficient evidence to sustain a conviction for tampering with evidence. At trial, the State had to prove beyond a reasonable doubt that:

1.     [D]efendant hid the body of [Victim], a knife, clothing, shoes and/or a vehicle;
2.     By doing so, [D]efendant intended to prevent the apprehension, prosecution or conviction of himself;
3.     This happened in New Mexico on or about December 18, 2007.

16

**{29}** While Defendant characterizes his argument as a "sufficiency of the evidence" challenge, it is undisputed that there was sufficient (if not overwhelming) evidence to sustain a conviction for tampering with at least some of the alternative items listed in the first element of the jury instruction. For instance, Defendant's own testimony plainly established that he removed Victim's body from Ruidoso, New Mexico, because he was afraid of being caught. And Defendant concedes that point on appeal, arguing instead only that "for the majority of the items, the crime happened outside of New Mexico." He thus contends that "it is unclear if the jury unanimously agreed" that he committed the crime of tampering with evidence based on a sufficient alternative (that he hid Victim's body), as opposed to an alternative for which there was no evidence that the crime occurred within the jurisdictional limits of New Mexico. We interpret this as a challenge to the general verdict form itself. *State v. Godoy*, 2012-NMCA-084, ¶ 6, 284 P.3d 410. Since Defendant did not object to the instruction, we review for fundamental error. *Id.* ¶ 4. "The doctrine of fundamental error applies only under exceptional circumstances and only to prevent a miscarriage of justice." *State v. Barber*, 2004-NMSC-019, ¶ 8, 135 N.M. 621, 92 P.3d 633.

**{30}** "[W]here alternative theories of guilt are put forth under a single charge, jury unanimity is required only as to the verdict, not to any particular theory of guilt." *Godoy*, 2012-NMCA-084, ¶ 6. Our Supreme Court has held that "a jury's general verdict will not be disturbed in such a case where substantial evidence exists in the

17

record supporting *at least one* of the theories of the crime presented to the jury." *State v. Salazar*, 1997-NMSC-044, ¶ 32, 123 N.M. 778, 945 P.2d 996 (emphasis added). In *State v. Olguin*, our Supreme Court applied the same principle but distinguished between "legally inadequate" and "factually inadequate" bases for conviction. 1995-NMSC-077, ¶ 2, 120 N.M. 740, 906 P.2d 731. Defendant seizes on that distinction, arguing that "the State lacked jurisdiction to proceed on most of the items listed in the jury instruction[,]" and therefore, at least some jurors may have convicted him on a "legally inadequate" basis.

{31} The argument is unpersuasive. The distinction between "legally inadequate" and "factually inadequate" bases for conviction is derived from the rationale that jurors are equipped to spot a factually inadequate theory but that their intelligence and expertise cannot ferret out an error in the law. *See Griffin v. United States*, 502 U.S. 46, 58-59 (1991). Thus, while it may be sensible to reverse a conviction where a general verdict makes it difficult to ascertain whether the conviction was based on a theory that violates double jeopardy (a legal error that the jury cannot be expected to guard against), *see, e.g.*, *State v. Rodriguez*, 1992-NMCA-035, ¶ 14, 113 N.M. 767, 833 P.2d 244, that same logic does not apply to the factual question before the jury in this case: whether Defendant tampered with Victim's body in New Mexico on or about December 18, 2007. The jury was well-equipped to make that determination, and there was ample evidence to support it. Under fundamental error review, we

18

conclude that Defendant's conviction does not shock the conscience of the Court or amount to a miscarriage of justice.

**CONCLUSION**

{32}    We affirm in all respects.

{33}    **IT IS SO ORDERED.**


_____
                              **LINDA M. VANZI, Judge**

**WE CONCUR:**


_____
**RODERICK T. KENNEDY, Judge**


_____
**MICHAEL E. VIGIL, Chief Judge**