# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: March 2, 2017

**NO. 34,572**

**ROY NEAL HOUGH,**

Petitioner-Appellee,

v.

**SUMMER LYNNE BROOKS,**

Respondent-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LINCOLN COUNTY**
**James Waylon Counts, District Judge**

Freda Howard McSwane, P.C.
Freda Howard McSwane
Ruidoso, NM

for Appellee

William N. Griffin
Ruidoso, NM

for Appellant

**OPINION**

**VANZI, Chief Judge.**

{1}     Summer Lynne Brooks (Mother) and her estranged husband, Roy Neal Hough (Father), entered into a stipulated interim order that allowed Mother to relocate with their four children from Ruidoso, New Mexico to Phoenix, Arizona. Approximately eight months later, the district court ordered that the children move back to Ruidoso to live with Father during the school year. On appeal, Mother argues that the district court erred by (1) drastically changing the primary custodial arrangement without first finding that a substantial and material change in circumstances had occurred, and (2) not making specific findings that the change was in the children's best interests. We hold that the district court abused its discretion by not finding "a substantial and material change in circumstances" before changing the existing custody arrangement, as required by the New Mexico Joint Custody Statute, NMSA 1978, § 40-4-9.1(A) (1999). We further hold that the district court abused its discretion by not conducting a best interests analysis and by failing to consider any of the statutorily mandated factors, under NMSA 1978, Section 40-4-9(A) (1977) and Section 40-4-9.1(B), and that the district court's custody determination was not supported by substantial evidence. Accordingly, we reverse.

## BACKGROUND

{2}      Although their marriage certificate was never filed, Mother and Father married in October 1999 and lived together with their four children in their family residence in Ruidoso. Mother is a school teacher, and Father is a wild-land firefighter employed by the U.S. Forest Service.

{3}      The couple's relationship deteriorated after a March 2012 incident in which Father kicked his eldest daughter, A.H., and broke her leg. Father was charged with child abuse and bribery of a witness for encouraging A.H. to lie about what had happened. Father pleaded no contest and received a conditional discharge. He was placed on three years of probation and was required to undergo counseling. The probation agreement stated that Father would "not associate with any person identified by [his p]robation/[p]arole [o]fficer as being detrimental to [his p]robation supervision," including any victim or witness of his crimes. Father admitted that A.H. was a victim of his crimes. After the charges were filed, Children, Youth and Families Department (CYFD) and Father's probation officer requested that Father leave the family residence for six months, after which he had limited contact with the children. Although Father did have phone calls with the children, they were intermittent as a result of his job, which often took him out of cell phone service.

{4} Father did not see or talk to A.H. for at least two years after the incident. A.H. is a special needs child, who had difficulties in school after the child abuse episode and was removed from school by Mother to be home-schooled for a period of time. A.H. had been evaluated after the child abuse incident and was diagnosed with childhood schizophrenia.

{5} In March 2014, Father filed a petition to determine paternity, custody, visitation, and child support (the petition). Specifically, Father sought joint legal and physical custody of the children and an order for child support pursuant to the New Mexico Child Support Guidelines. Mother did not dispute paternity and agreed that Father should be granted legal or physical custody but stated that he should not be granted unsupervised visitation until he completed his probation and counseling. Mother also did not deny that child support should be awarded.

{6} Two weeks after Father filed the petition and before Mother had an opportunity to file her answer, Father's parents (Grandparents) filed a motion to intervene. The motion sought, among other things, to allow Grandparents, who were residents of Tennessee, to assist in making decisions about the children because Father was "unable to properly care for the minor children alone based on his employment." Mother objected to the motion to intervene arguing lack of jurisdiction and other legal grounds. The district court ultimately denied Grandparents' motion in October 2014.

3

{7}     Father and Mother entered into a joint stipulated custody, visitation, and support agreement and, on June 3, 2014, the district court entered a stipulated interim order reflecting the parties' agreement. The stipulated interim order provided, in relevant part:

> 2.      [Mother], upon providing proof of employment [for a teaching position] in Phoenix, Arizona, shall be allowed to relocate to Phoenix, Arizona with the minor children.
>
> 3.      [Father] shall have a two[-]week period of responsibility with the minor children for two . . . weeks after the end of the 2013-2014 school year in Ruidoso, New Mexico. Said period of responsibility shall take place at the children's residence[.] . . . Such supervised visitation shall be from July 6, 2014 through July 20, 2014.
>
> 4.      [Father's] parents shall supervise this visitation by remaining at the residence with [Father] and the minor children.
>
> 5.      After the minor children have relocated to Phoenix, Arizona, [Father] shall be allowed nightly phone calls with the minor children and Skype visits with the minor children at least two . . . times per week.
>
> 6.      Until further [o]rder of this [c]ourt, [Father] shall pay child support to [Mother] in the amount of $949.81.

{8}     In the summer of 2014, Mother obtained a teaching position at a private school in Phoenix, Arizona, and pursuant to the stipulated interim order, relocated with the children to Phoenix. Three of the children attended the private school as a benefit of Mother's employment, and A.H. attended a special school.

4

**{9}** Shortly thereafter, Father filed a motion to show cause, alleging that he had "placed a phone call every night" to the children since July 20, 2014, as permitted by the stipulated interim order, but had not been able to reach the children. Mother denied that she missed multiple phone calls from Father, and filed a countermotion, alleging that Father "has underpaid, or failed to pay, child support each month since June[] 2014." According to Father, he paid utility bills on the family residence that Mother had left unpaid and had given Mother an extra child support payment in March 2014. The record does not indicate whether the district court ruled on this matter.

**{10}** Six months after the stipulated interim order was entered, the district court held a child custody hearing. Both Father and Mother testified. Father said that he was in favor of the move when it occurred and agreed that there were ample doctors in Arizona that were better suited to address A.H.'s needs. In addition, Father knew that one of his sons had struggled in Ruidoso public schools because of the son's speech difficulties. Nevertheless, Father no longer wanted the children to reside in Arizona. He admitted that he "did not keep up with any of the kids while they were in school" in Ruidoso and further acknowledged that he had no reason to believe the children were not doing well in Arizona.

{11} Mother testified that the children were happy and doing well in the Phoenix private school, and the child with speech issues received specialized support for his disability. Furthermore, Mother said that A.H., who had struggled after the 2012 incident with Father, was doing better in Phoenix and was slated to get special treatment where she would attend support sessions and where a psychiatrist and case manager would visit her in the home.

{12} Testimony at the hearing established that, prior to the time he was required to leave the family home, Father had undertaken numerous remodeling projects in the Ruidoso residence that remained unfinished when he left. Father admitted that while he lived there, he had punched holes in the walls. According to Mother, she had difficulties with mice coming in through one of the areas involving Father's unfinished projects. Mother had neither the money nor the skills to make repairs or finish the projects once Father was out of the house, nor did she allow Father to come back to make repairs. Mother stated that she did not want Father in the home because he was aggressive and could not control his temper. Moreover, having Father come into the home to make repairs never panned out because of Father's work schedule and because A.H. was in the home. The result was that, at the time of Father's July 2014 visitation period, which took place in the family's Ruidoso residence, the

6

condition of the home was "horrible." According to Father, the house smelled of urine, was filthy, and there were mice feces throughout the premises.

{13} With respect to Grandparents, prior to the two-week visitation period in July 2014, it had been seven years since Grandparents had interacted with any of the children, and they had never met the two younger children. The decision to cut off contact between Grandparents and the children had been a mutual decision between Father and Mother. Notwithstanding that they did not know the children, Father testified that Grandparents would move to New Mexico from Tennessee to help him with the children if he was granted custody during the school year. Father's mother also testified to the same effect. There is no evidence in the record indicating whether Grandparents actually moved to New Mexico.

{14} At a December 2014 hearing, the district court entered an order requiring that the children spend Christmas break with Father. The exchange was to take place in Lordsburg, New Mexico on December 20, 2014, and the children were to be returned to Mother in Lordsburg on January 3, 2015. A.H. did not arrive in Lordsburg as required by the order. Father filed a motion to show cause, alleging that Mother had refused to bring A.H. for Christmas break and that, therefore, Mother should be held in contempt. Mother responded that she "did everything within her power to compel [A.H.] to go" and that A.H. herself had refused to go to Lordsburg for the holiday

exchange. Mother reiterated that A.H. had been "gravely injured" by Father, that she had been diagnosed with schizophrenia and posttraumatic stress disorder (PTSD), that Father was under a probation order not to have contact with A.H., and that A.H. wanted "an audience with the [j]udge in chambers to express her desires [regarding] visitation with [Father]." Moreover, A.H.'s counselor was developing a treatment plan, recommending that A.H. and Father develop their relationship in "calculated stages."

{15}    At a show cause hearing on March 30, 2015, A.H. testified that she did not want to go to Lordsburg because Father's physically abusive behavior made her feel unsafe. She also said that one of her counselor's had developed a plan for her in which she would establish a relationship with Father at her own pace. A.H. stated that the day of the holiday exchange, Mother tried to make her go, but she had locked herself in her room and refused to come out. Notwithstanding A.H.'s testimony and that it had previously required visitation with the children to be supervised, the district court held Mother in contempt, stating that she did not do "what was necessary to carry out the [district court's] order" and ordered Mother to pay Father's attorney fees.

{16}    On March 6, 2015, the district court memorialized its January 30, 2015 minute order in a court-ordered parenting plan (the parenting plan). The parenting plan

granted joint legal custody to Father and Mother of all the minor children, with Father being the primary physical custodian. Beginning with the 2015-2016 school year, the children would reside with Father in Ruidoso "from one week before the start of school through one week following the end of the school year." This order invariably conflicted with Father's probationary status as it related to A.H., as his probation was not scheduled to end until December 2015. The parenting plan provided that the "children shall spend the summer break with [Mother] commencing one week after the end of . . . school through one week before the beginning of school." Although the district court stated that it was in the best interests of the children to have "a significant relationship with . . . [F]ather and [Grandparents,]" the parenting plan does not provide a best interests analysis. Nor does it address any statutory factors as a basis for the custody determination. Instead, the parenting plan simply stated that the children's relationship with Father "cannot be fostered if the children only see [him] in the summer because his work requires him to be away from home for significant periods of time in the summer due to fire season." And, "[Mother] can best maintain her relationship with the children during the summer months since she is a teacher and will have summers off." The parenting plan provided no guidance for transition from Mother's care to Father, nor did it address any particulars with respect to A.H.

{17} In sum for ease of reference, the pertinent and material events and dates set out above started in March 2012. Father had limited contact with the children from about March 2012 until about at least March 2014 when he filed his petition and likely until June 3 2014, which would have been over two years. Mother relocated to Phoenix with the children around mid-summer 2014, pursuant to the stipulated interim order. Father had a two-week visitation with the children, except A.H., in July 2014. In December 2014, following a September motion for an order to show cause, the court ordered visitation with Father over Christmas break in December 2014. There was a January 30, 2015 minute-ordered parenting plan, memorialized on March 6, 2015, ordering joint legal custody with Father having primary physical custody of all of the children. A show cause hearing occurred on March 30, 2015. We now turn to the arguments on appeal.

**DISCUSSION**

**Standard of Review**

{18} We review a district court's child custody determination for abuse of discretion, and we will uphold the district court's findings if they are supported by substantial evidence. *Grant v. Cumiford*, 2005-NMCA-058, ¶ 13, 137 N.M. 485, 112 P.3d 1142. "An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Id.*

10

(internal quotation marks and citation omitted). "Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion." *State ex rel. King v. B & B Inv. Grp.*, 2014-NMSC-024, ¶ 12, 329 P.3d 658 (internal quotation marks and citation omitted). In addition, the failure of a district court to apply the applicable statutory guidelines to order a change of custody will constitute an abuse of discretion. *State ex rel. Children, Youth & Families Dep't v. Michelle B.*, 2001-NMCA-071, ¶ 27, 130 N.M. 781, 32 P.3d 790.

**The District Court Abused Its Discretion by Not Finding a Substantial and Material Change in Circumstances**

{19}    Mother's first argument on appeal is that the district court "erred in drastically changing the primary custodial arrangement, requiring the children to move back to Ruidoso from Phoenix[.]" In particular, Mother contends that the district court erred by not making a finding that there was a substantial and material change in circumstances, as required by Section 40-4-9.1(A), justifying a modification of the stipulated interim order. Father responds that the stipulated interim order was not a final order and that, therefore, departure from or modification of the order did not require a showing of a substantial and material change in circumstances. For the reasons that follow, we agree with Mother.

{20}    Pursuant to NMSA 1978, Section 40-4-7(G) (1997), "[t]he court may modify and change any order or agreement merged into an order in respect to the

11

guardianship, care, custody, maintenance or education of the children whenever circumstances render such change proper." However, such a modification or change may occur "only upon a showing of a substantial change in circumstances since the prior order that affects the best interests of the children." *Grant*, 2005-NMCA-058, ¶ 13 (internal quotation marks and citation omitted). Section 40-4-9.1(A) specifically states,

> Joint custody shall not be awarded as a substitute for an existing custody arrangement unless there has been a substantial and material change in circumstances since the entry of the prior custody order or decree, which change affects the welfare of the child such that joint custody is presently in the best interests of the child.

{21} The question of whether the above statute applies to the present situation is an issue of statutory construction that we review de novo. *See State v. Saiz*, 2001-NMCA-035, ¶ 2, 130 N.M. 333, 24 P.3d 365. In engaging in statutory interpretation, "our primary goal is to give effect to the intent of the [L]egislature[,]" and in doing so, "we look first to the plain language of the statute." *Id.*

{22} As noted above, Section 40-4-9.1(A) states, "Joint custody shall not be awarded as a substitute for an *existing custody arrangement* unless there has been a substantial and material change in circumstances." (Emphasis added.) There is nothing in this section that indicates an existing custody arrangement must be based on a final order or entered after a merits hearing, as Father contends. Indeed, no case

has been cited to us, nor has any been found, that would limit the application of Section 40-4-9.1(A) solely to final orders. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 (stating that where a party cites no authority to support an argument, we may assume no such authority exists). To the contrary, the plain language of the statute refers—without limitation—to any "existing custody arrangement" that is instituted by court "order or decree[.]" Section 40-4-9.1(A). We will not depart from the clear meaning of the plain language of the statute, which by its terms, encompasses the stipulated interim order because the district court's order created an "existing custody arrangement." *See id. See generally Summers v. N.M. Water Quality Control Comm'n*, 2011-NMCA-097, ¶ 16, 150 N.M. 694, 265 P.3d 745 (observing that, when considering the plain language of the words in a statute, we "assume that the ordinary meaning of the words expresses the legislative purpose" (internal quotation marks and citation omitted)).

{23} Under the stipulated interim order, Mother was to be the sole custodian of the children by virtue of her relocation with the children to Phoenix. *See* § 40-4-9.1(L)(8) (defining "sole custody" as "an order of the court awarding custody of a child to one parent"). The stipulated interim order does not make any provision for joint custody or for Father's custody. Father was only granted "supervised visitation" for a two-week period of time. *See* § 40-4-9.1(L)(9) (" '[V]isitation' means a period of time

available to a noncustodial parent, under a sole custody arrangement, during which a child resides with or is under the care and control of the noncustodial parent."). Therefore, the stipulated interim order created a sole custody arrangement, and the district court's entry of the March 2015 parenting plan granting Mother and Father joint legal custody, necessarily required a showing of a "substantial and material change in circumstances." *See* § 40-4-9.1(A) ("Joint custody shall not be awarded as a substitute for an existing custody arrangement unless there has been a substantial and material change in circumstances.").

{24}     We emphasize that facts, as always, are important, and we reach our decision today based on the specific and unique circumstances of this case. We do not suggest that all interim orders will require a showing of a "substantial and material change in circumstances" but where, as in the present case, the district court's order establishes a durable custody arrangement with substantial provisions for the children's relocation with one parent out of state and no indication that the custody determination would be revisited, any modification of that order must be accompanied by a showing of a substantial and material change of circumstances. *Cf. Lawson v. Lawson*, 48,296, p. 5 (La. App. 2 Cir. 7/24/13), 121 So. 3d 769, 772 (explaining that, under the facts of the case, a "judgment [that] was designated an 'interim judgment' . . . was a final judgment as to every issue except the choice of

14

school for the child" because the stipulated interim judgment indicated that the only matter that would be revisited would be the child's school); *Chandler v. Chandler*, 48,891, pp. 5-6 (La. App. 2 Cir. 12/13/13), 132 So. 3d 413, 417 (concluding that, an interim judgment that was consented to by both parents "was a final judgment as to every issue concerning custody" and that in order for the nondomiciliary parent to obtain a change in custody, she had "the burden of showing that there had been a material change in circumstances since the interim decree was entered").

{25} There is nothing in the stipulated interim order establishing that the custody arrangement was temporary or subject to change. There was no set time frame during which Mother's custody of the children was to be reevaluated or for which the order was set to expire. In contrast, the district court's child support order, which was also contained in the stipulated interim order, stated, "Until further [o]rder of this [c]ourt, [Father] will pay child support to [Mother] in the amount of $949.81." The language "[u]ntil further [o]rder of this [c]ourt" demonstrates that the parties and district court left open a future adjustment of child support. *Cf. Lawson*, 121 So. 3d at 772-73 (discussing whether a stipulated interim judgment was final as to choice of school and custody). There is no such similar language with respect to the custody arrangement contained in the stipulated interim order. Instead, the stipulated interim order permitted Mother to relocate to another state with the children and did not indicate

that such relocation would be temporary or was subject to further order of the district court. Allowing relocation with one parent, especially a relocation that occurs across state lines and thus inherently involves removing children from their current home, school, and community, and placing them in new ones, is a consequential decision, which we conclude, under the facts of this case, created an "existing custody arrangement." Section 40-4-9.1(A). Accordingly, we hold that any modification or change from the stipulated interim order required a showing of a "substantial and material change in circumstances." *See Schuermann v. Schuermann*, 1980-NMSC-027, ¶¶ 4, 7, 94 N.M. 81, 607 P.2d 619 (stating that there is a strong presumption in favor of the original custody arrangement, and the party seeking to alter the status quo bears the burden of proving a change in circumstances).

{26} The district court in this case did not consider whether there was a substantial and material change in circumstances affecting the best interests of the children between the entry of the stipulated interim order and the custody hearing. Neither the minute order nor the parenting plan contain any findings or conclusions in this regard, nor is there any mention of Section 40-4-9.1 or its standards for determination of a custodial re-assessment. Importantly, it appears the primary—if not sole—basis for the change in custody was the district court's determination that

> [i]t is in the best interests of the minor children that they have a
> significant relationship with . . . [F]ather and [Grandparents]. Said

16

relationship cannot be fostered if the children only see [Father] in the summer time because his work requires him to be away from home for significant periods of time in the summer due to fire season. [Mother] can best maintain her relationship with the children during the summer months since she is a teacher and will have summers off.

We conclude that the district court's failure to consider whether a material change in circumstances affecting the best interests of the children occurred and granting joint legal custody constituted an abuse of discretion. Although we could reverse on this basis alone, we take the opportunity to address Mother's remaining arguments.

**The District Court Abused Its Discretion in Granting Joint Custody Because It Did Not Conduct a Best Interests Analysis**

{27}   Mother's second argument on appeal is that the district court "erred in making the change to the custodial arrangement without making specific findings that such a change was in the children's best interests." Mother also argues that the district court erred by not making specific findings concerning implementing protection for A.H. On both these points, we agree with Mother.

{28}   The guiding principle in child custody determinations is the best interests of the child. *See Jaramillo v. Jaramillo*, 1991-NMSC-101, ¶ 13, 113 N.M. 57, 823 P.2d 299 ("The 'best interests' criterion . . . is the lodestar for determining a custody award, under both statute and case law in New Mexico[.]"); *Schuermann*, 1980-NMSC-027, ¶ 4 ("[T]he controlling inquiry of the [district] court in settling any custody dispute is the best interests of the child."). Pursuant to Section 40-4-9(A),

"[i]n any case in which a judgment or decree will be entered awarding the custody of a minor, the district court shall, if the minor is under the age of fourteen, determine custody in accordance with the best interests of the child."[1] The statute further specifies that the district court must "consider all relevant factors" in its best interests analysis, including:

> (1)    the wishes of the child's parent or parents as to his custody;
> (2)    the wishes of the child as to his custodian;
> (3)    the interaction and interrelationship of the child with his parents, his siblings and any other person who may significantly affect the child's best interest;
> (4)    the child's adjustment to his home, school and community; and
> (5)    the mental and physical health of all individuals involved.

*Id.* Importantly, "[i]f the minor is fourteen years of age or older, the court shall consider the desires of the minor as to with whom he wishes to live before awarding custody of such minor." Section 40-4-9(B).

---

[1]We note that the best interests analysis applies in all custody decisions. *See id.* (stating that any custody dispute should be determined based on the best interests of the child). While we recognize that there did not appear to be a best interests analysis conducted with respect to the stipulated interim order, we stress that New Mexico law gives preference to custody arrangements reached by the parties, unless the district court finds that the agreement is contrary to the best interests of the child. *See* § 40-4-9.1(D) ("In any case in which the parents agree to a form of custody, the court should award custody consistent with the agreement unless the court determines that such agreement is not in the best interests of the child."). Because there was no finding that the stipulated interim order, which was based on the parties' agreement, was not in the best interests of the children, we conclude that the order properly went into effect.

{29}     When a district court is determining whether joint custody should be awarded, the district court is required to consider not only the factors discussed above under Section 40-4-9(A), which are applicable to all child custody determinations, but additional factors under Section 40-4-9.1(B). The additional factors are as follows:

> (1)     whether the child has established a close relationship with each parent;
> (2)     whether each parent is capable of providing adequate care for the child throughout each period of responsibility, including arranging for the child's care by others as needed;
> (3)     whether each parent is willing to accept all responsibilities of parenting, including a willingness to accept care of the child at specified times and to relinquish care to the other parent at specified times;
> (4)     whether the child can best maintain and strengthen a relationship with both parents through predictable, frequent contact and whether the child's development will profit from such involvement and influence from both parents;
> (5)     whether each parent is able to allow the other to provide care without intrusion, that is, to respect the other's parental rights and responsibilities and right to privacy;
> (6)     the suitability of a parenting plan for the implementation of joint custody, preferably, although not necessarily, one arrived at through parental agreement;
> (7)     geographic distance between the parents' residences;
> (8)     willingness or ability of the parents to communicate, cooperate or agree on issues regarding the child's needs; and
> (9)     whether a judicial adjudication has been made in a prior or the present proceeding that either parent or other person seeking custody has engaged in one or more acts of domestic abuse against the child, a parent of the child or other household member. If a determination is made that domestic abuse has occurred, the court shall set forth findings that the custody or visitation ordered by the court adequately protects the child, the abused parent or other household member.

Section 40-4-9.1(B).

19

{30} While the "best interests test is broad and vests the [district court] with considerable discretion[, t]he exercise of discretion by the [district court] . . . must be consistent with the evidence" and statutory requirements. *Schuermann*, 1980-NMSC-027, ¶ 8 (internal quotation marks omitted); *Newhouse v. Chavez*, 1988-NMCA-110, ¶ 24, 108 N.M. 319, 772 P.2d 353 (setting forth the statutory requirement that a district court must find a "substantial and material change in circumstances" in order to modify an existing custody arrangement (internal quotation marks and citation omitted)).

{31} Here, our review of the record reveals that the district court did not make any specific findings related to any of the statutorily mandated factors it was required to consider when making a custody determination. The district court made only vague and broad statements in findings regarding the children's best interests, stating that, "[i]t is in the best interests of the minor children that they have a significant relationship with . . . [F]ather and [Grandparents]" and that "[t]he best interests of the children are the primary consideration for the [district c]ourt in making time sharing decisions." The district court insinuated that the best interests of the children involved spending the "maximum amount of quality time" with each parent but did not articulate any reason why that was in the children's best interests to relocate them again considering the evidence before it.

{32}   Although we stress that the district court's failure to consider any of the statutory factors constituted error, the court's neglect of some particularly relevant factors illustrates the court's abuse of discretion in this case. For instance, the district court did not consider the wishes of any of the four minor children in making its custody determination. *See* § 40-4-9(A)(2) (requiring the district court to consider the children's wishes as to their custody). And importantly, the district court did not consider the wishes of A.H., who was fourteen years old at the time of the custody hearing. *See* § 40-4-9(B) ("If the minor is fourteen years of age or older, the court shall consider the desires of the minor as to with whom he wishes to live before awarding custody of such minor."). The wishes of the children, considering that they had limited contact with Father for two years and had essentially been in Mother's sole custody since the child abuse incident, would certainly have been vital information for the district court to take into account. Had the district court inquired as to A.H.'s wishes, the record suggests that she likely would have indicated her desire not to be in Father's custody. In fact, A.H. testified at a show cause hearing that she did not feel safe with Father because of his physically abusive behavior and the episode in which he kicked her so hard he broke her leg. Because the district court did not take into account A.H.'s wishes, as it was required to by statute, the district court placed her in the primary physical custody of a parent with whom she had not

seen or talked to for at least two years and with whom she did not feel safe, very probably contrary to her best interests.[2] *See generally Jaramillo*, 1991-NMSC-101, ¶ 14 (explaining that a parent has primary physical custody of a child if the child lives with that parent for more than half of the time).

{33}     Likewise, the district court did not discuss with any specificity how the children's interactions and interrelationships with Mother, Father, and Grandparents affected their best interests in either the minute order or parenting plan. *See* § 40-4-9(A)(3) (requiring the district court to consider "the interaction and interrelationship of the child with his parents, his siblings and any other person who may significantly affect the child's best interest"); § 40-4-9.1(B)(1) (requiring the district court, in a joint custody determination, to consider "whether the child has established a close relationship with each parent"). Nor did the district court address whether the children would benefit from increased contact with Father. *See* § 40-4-9.1(B)(4) (requiring the district court to consider whether the children's "development [would] profit from [predictable and frequent] involvement and influence from both parents"). But

---

[2]We recognize that the parties did not offer any evidence at the December 2014 custody hearing indicating the children's preference or desires as to their custody. However, where the parties have not provided sufficient information for a court to address the relevant statutory considerations, it is incumbent on the district court "to elicit further information on its own motion." *See Jaramillo*, 1991-NMSC-101, ¶ 27 (explaining that a court should take the initiative to seek relevant information when it is not provided by the parties in a child custody dispute).

Father's extended period of limited contact with the children and Mother's role as sole caretaker merited analysis with respect to how the children's relationship with their parents would be affected by any change to the status quo.

{34} The considerable need for stability and continuity in the children's custody arrangement and the damage that might occur from disrupting established patterns of care, relationships, and emotional connections with Mother—the primary caretaker—warranted the district court's consideration. *See Schuermann*, 1980-NMSC-027, ¶ 7 (explaining that, generally, a child's best interests will not be served by modifying a custody arrangement unless there has been a substantial change in circumstances, for example, if the current custody situation "prevents the child from receiving proper care or from enjoying stable family relationships").

{35} Furthermore, the district court made no findings about how the children's relationship with Grandparents factored into the children's best interests in light of the fact that they had no contact with them for seven years and would allegedly be moving to New Mexico to help care for them. *See Newhouse*, 1988-NMCA-110, ¶ 20 (concluding that the district court erred in not making any "findings addressing the interests of the children in their relationship with [their] mother, their younger sibling or their stepfather, or as to the interdependent relationships within this family, although there was evidence from which the [district] court could have made such

findings[,]" and because there were no "findings to indicate that the [district] court considered the effect of its judgment on these relationships" (citation omitted)).

{36} In addition, the district court did not consider the impact that moving the children from Phoenix back to Ruidoso would have on them. *See* § 40-4-9(A)(4) (requiring the district court to consider the "child's adjustment to his home, school and community"). The district court first granted the stipulated interim order, which permitted Mother to relocate to Phoenix with the children in the summer of 2014 and then subsequently ordered that the children move back to Ruidoso to live with Father for the commencement of the 2015-2016 school year, after they had already completed a year of school in Phoenix.[3] The district court did not analyze whether removing the children from their home, school, and community for the second time in a year would have any negative impact on their best interests. As our Supreme Court has observed, "[f]requent changes of schools and home locations, differences in family structures and in parental personalities are difficult for children to adapt to even under the best of circumstances." *Schuermann*, 1980-NMSC-027, ¶ 7. The district court failed to accord any weight to these considerations—the children's need

---

[3]Of significance, we note that the district court's order requiring all four children to live with Father commencing with the start of the 2015-2016 school year appears to conflict with his probation agreement, which expired in December 2015, and stated that Father should not associate with any person detrimental to his probation supervision, which may include any victim of his crimes.

for a stable environment and the impact of uprooting them once again not only from their home, school, and community, but also from the primary care of Mother.

{37} Also, the evidence adduced at the custody hearing regarding the children's adjustment to their new private school in Phoenix indicated that the children were excelling and doing better than they had at the public schools in Ruidoso. There was evidence that the child with a learning disability was getting specialized attention and A.H. was receiving individualized treatment for her special needs. Father even admitted that the doctors in Phoenix were better suited for A.H. and that he had no reason to believe that the children were not doing well in Phoenix. Had the district court considered the children's positive adjustment to their new home, school, and community, as required by Section 40-4-9(A)(4), the evidence would have weighed in favor of maintaining their current custody arrangement. *See Schuermann*, 1980-NMSC-027, ¶ 7 ("Modifications in custody should not be granted too quickly.").

{38} Finally, the district court neglected to examine the impact of placing A.H. in Father's primary physical custody. *See* § 40-4-9.1(B)(9) (requiring the district court to consider "whether a judicial adjudication has been made in a prior or the present proceeding that either parent or other person seeking custody has engaged in one or more acts of domestic abuse against the child"). The district court heard testimony regarding the incident in which Father broke A.H.'s leg, and the court took judicial

25

notice of the child abuse charge and the probation agreement. The district court also noted the incident in its findings of fact. Nonetheless, the district court inexplicably failed to factor either the probation agreement or the child abuse into any best interests analysis. While we note that Father received a conditional discharge, and a conditional discharge is not an adjudication of guilt under New Mexico law, *see* NMSA 1978, § 31-20-13(A) (1994), evidence at the custody hearing indicated that A.H. was negatively impacted by the incident and had difficulties coping with it. The district court, therefore, abused its discretion in not considering how the abuse and A.H.'s relationship with Father affected her best interests. And significantly, the district court failed to make any findings on whether granting Father primary physical custody would adequately protect A.H. *See* § 40-4-9.1(B)(9) ("If a determination is made that domestic abuse has occurred, the court shall set forth findings that the custody or visitation ordered by the court adequately protects the child[.]").

{39} To summarize, because the district court did not consider the statutorily mandated factors relevant to a determination of the children's best interests, the district court abused its discretion in granting joint custody to Mother and Father and in awarding primary physical custody to Father.

**There Was Not Substantial Evidence Supporting the District Court's Findings**

{40} Turning next to the issue of substantial evidence, we conclude, for the ensuing reasons, that there was not substantial evidence for the district court's findings and ultimate award of joint custody with primary physical custody being awarded to Father. *See Grant*, 2005-NMCA-058, ¶ 13 (explaining that we will uphold a district court's custody findings if they are supported by substantial evidence).

{41} This Court will not reweigh evidence on appeal or substitute our judgment for that of the district court. *See Jeantete v. Jeantete*, 1990-NMCA-138, ¶ 8, 111 N.M. 417, 806 P.2d 66 ("[T]he appellate court will not reweigh the findings of the [district] court involving disputed testimony or inferences to be drawn therefrom, nor the [district] court's determination as to the credibility of the witnesses."). The district court's findings, nevertheless, must be supported by "such relevant evidence that a reasonable mind would find adequate to support a conclusion." *State v. Brown*, 2014-NMSC-038, ¶ 43, 338 P.3d 1276 (internal quotation marks and citation omitted).

{42} Here, the district court made numerous findings that were not supported by substantial evidence, which apparently informed its custody determination. The district court, for example, found that Mother had "engaged in a deliberate program of alienation of the children from [Father and his] family," but the undisputed evidence was that Father had moved out of the family home after the child abuse

incident, and his limited contact with the children had started at that time. Morever, CYFD had specifically required that Father stay out of the home for a period of time after the incident, and the probation agreement required Father to refrain from associating with persons detrimental to his probation supervision, which may include any victim of his crimes. The evidence in the record, therefore, established that Father's alienation from the family was largely caused by his own actions, and not Mother's "deliberate program of alienation."

{43} Similarly, the district court found that Mother "would not cooperate with allowing calls from [Father,]" but Mother alleged that she had missed only one call from Father during the time in question. Father himself acknowledged that his phone calls with the children "were intermittent at best, sometimes due to my job, being in remote areas [and] not having service." The district court's finding that Mother had alienated relatives from the children was belied by its contrary finding that the decision to cut off contact with Grandparents and other family members was a mutual decision made by Father and Mother.

{44} We note as well the district court's findings that the family residence was in a state of disrepair and Mother "could never find time in her schedule to allow [Father] to come in" and make the repairs and that Mother "did not make any improvements to the home while [Father] was out of the house and the conditions were poor." Yet,

28

the undisputed evidence showed that Father had left many projects unfinished when he left the house due to the child abuse incident. Moreover, the district court apparently did not give any weight to the reasons why Mother prevented Father from returning to the home, such as Father's anger issues and aggressive behavior.

{45} We are unpersuaded by any weight given by the district court that Mother had refused to return excess child support and that Father had been forced to pay unpaid utility bills. The court wholly failed to relate these findings to a best interests analysis or indicate how this evidence supported its joint custody determination. *See Jaramillo*, 1991-NMSC-101, ¶ 13 ("The 'best interests' criterion . . . is the lodestar for determining a custody award[.]"). Nothing in the minute order or parenting plan establishes that it was not in the children's best interests to remain in Mother's primary care in Phoenix. Indeed, our review of the record does not reveal any evidence supporting the notion that it was in the children's best interests to be removed from their primary caretaker, their home, or their school in Phoenix. Lastly, the district court also did not cite any facts supporting that it was in the children's best interests to have a relationship with Grandparents, who they barely knew and who would allegedly be moving to New Mexico to help care for them.

{46} Considering the foregoing discussion—the district court's findings and subsequent child custody order giving Father primary physical custody during the

school year—was not supported by substantial evidence. *See Grant*, 2005-NMCA-058, ¶ 13 ("[W]e will uphold the [district] court's [custody] findings if supported by substantial evidence." (internal quotation marks and citation omitted)); *see also Brown*, 2014-NMSC-038, ¶ 43 ("Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion." (internal quotation marks and citation omitted)).

{47}    We reverse the district court's March 2015 parenting plan with the following instructions. Because the children are in the middle of the school year and have been living with Father for the past five months, we recognize the disruption our decision will have on their lives yet again. The district court should consider appointing a neutral guardian ad litem (GAL), pursuant to Rule 1-053.3(A) NMRA, which will allow the GAL to work with the parents and the court to arrive at an orderly transition plan from Father's custody back to Mother. The district court is to hold a hearing within forty-five days of the date of this opinion and should enter an order implementing the plan no later than five business days after the hearing.

**CONCLUSION**

{48}    For the reasons stated, we reverse and vacate the district court's March 2015 parenting plan with instructions as set forth above.

{49}    **IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Chief Judge**

**WE CONCUR:**

_____
**JONATHAN B. SUTIN, Judge**

_____
**MICHAEL E. VIGIL, Judge**